ÁNGEL PORTILLA, haciendo negocios bajo el nombre de A. PORTILLA & Co., demandante y apelante, *v.* BANCO POPULAR DE PUERTO RICO, demandado y apelado.

Número 10619.

*Sometido:* 9 de diciembre de 1952. *Resuelto:* 30 de junio de 1953.

102

*L. E. Dubón, R. García Cintrón, L. Ríos Algarín, F. Fornaris, Jr., Diego Guerrero Noble y Jaime Pieras, Jr.,* abogados del apelante; *Damián Monserrat, Jr., Gabriel de la Haba y Rafael Baragaño, Jr.,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

Este caso envuelve una reclamación por un total de $26,139.39 que, según el demandante, le han sido indebidamente cargados a su cuenta corriente por el banco demandado, como consecuencia del pago de una serie de cheques girados con su firma falsificada. La demanda fué declarada sin lugar, imponiéndose al demandante el pago de las costas del litigio, más la suma de $1,000 para honorarios de abogado de la parte demandada; de todo lo cual, el demandante ha apelado ante este Tribunal.

El tribunal a quo formuló las siguientes conclusiones sobre los hechos:

"Que el demandante, Ángel Portilla, haciendo negocios bajo el nombre de A. Portilla & Co., abrió una cuenta corriente en el Banco de Puerto Rico allá para el 5 de julio de 1933. Al fusionarse el Banco de Puerto Rico con el Banco Popular de Puerto Rico la cuenta corriente de A. Portilla & Co. pasó a este último banco, convirtiéndose el demandante en uno de los cuentacorrentistas del banco demandado.

"La cuenta corriente del demandante en el Banco de Puerto Rico fué abierta sin que por el banco depositario se impusiera

condición especial alguna al depositante relativa al deber de examinar los estados de cuenta que rinden mensualmente las instituciones bancarias. Al pasar la cuenta del demandante al banco demandado ninguna condición se le impuso obligándole al examen de los estados de cuenta mensuales; ni se le advirtió que debía examinar dichos estados de cuenta y formular reparos si no eran de su conformidad, como tampoco se le llamó la atención al texto, que aparece de los estados, al efecto de que el banco consideraría que la cuenta merecía la conformidad del depositante de no avisarse reparos dentro de diez (10) días.

"En los archivos del Banco Popular de Puerto Rico aparece solamente una tarjeta con la firma registrada del cuentacorrentista demandante A. Portilla & Co. El Banco Popular de Puerto Rico exige dos tarjetas de registro de firmas, y si la cuenta es una conjunta, exige tres, pero no aparece de la prueba el número de tarjetas de registro de firmas que exigía el Banco de Puerto Rico. De acuerdo con la firma registrada por el demandante los cheques librados contra su cuenta corriente en el banco demandado debían pagarse únicamente cuando aparecieran firmados con la firma registrada de A. Portilla & Co. y a excepción del período comprendido entre los años 1935 y 1938, durante los cuales Alfredo Argüelles estuvo autorizado para girar contra la cuenta corriente del demandante, los retiros de fondos podían operarse únicamente mediante el libramiento de cheques firmados por el propio demandante usando la firma registrada de A Portilla & Co.

"Allá para fines del año 1939, o a principios de enero de 1940, el demandante hizo un arreglo con Teodomiro Rangel, contable de profesión, para que este le atendiera toda la contabilidad de su casa de comercio, inclusive la cuenta en el banco demandado, revisara las facturas, atendiera la correspondencia y preparara los cheques. A estos efectos Rangel visitaba la casa de comercio de Portilla dos veces al mes, usualmente después de las horas de oficinas y en domingos, y por estas gestiones recibía una compensación de Cinco Dólares semanales.

"El demandante había conocido a Rangel desde 1927 y había conocido a sus padres. Rangel había trabajado anteriormente con Portilla; había vivido en casa de Portilla y disfrutaba de toda la confianza de éste. Portilla nunca había tenido motivo alguno para dudar de Rangel.

"En algún momento en el mes de enero de 1940, Teodomiro Rangel concibió la idea de defraudar a Portilla y al banco de-

mandado, falsificando la firma de A. Portilla & Co. en cheques girados contra la cuenta del demandante en el banco demandado y librando los mismos. A partir del 16 de enero de 1940 y hasta el 18 de enero de 1943 Rangel falsificó la firma de Portilla en ciento setentiún cheques expedidos [al portador], por un total de Veintiséis Mil Ciento Treintinueve Dólares Treintinueve Centavos ($26,139.39). De los ciento setentiún cheques falsificados solamente cuatro originales y noventa y tres fotografías fueron presentados como prueba. La prueba en conjunto, sin embargo, especialmente la declaración de José Díaz Santiago, el informe de este testigo, admitido en sustitución de su declaración, y el testimonio de Rangel sobre la forma en que encubría las falsificaciones, demuestra que Rangel falsificó y el banco demandado pagó ciento setentiún cheques por la suma de Veintiséis Mil Ciento Treintinueve Dólares Treintinueve Centavos ($26,139.39).

"Las falsificaciones de la firma de Portilla en los cheques pagados por el banco demandado fueron hábilmente hechas. Resulta imposible en ausencia de sospecha, para una persona que no sea un perito en la materia descubrir las falsificaciones. Las firmas falsificadas son tan parecidas a la firma que aparece en la tarjeta de registro de firmas que el perito del demandante creyó, antes de examinar con detenimiento la firma registrada, que ésta también era falsificada, y el propio demandante admitió que cuando se le mostraron unas películas de los cheques, no estuvo en condiciones de señalar los cheques falsificados.

"Los cheques falsificados nada tienen que pudieran levantar sospechas en los empleados del banco demandado. No contienen borrones o raspaduras, ni aparecen cheques sin fecha, o con fecha adelantada o atrasada.

"A través de todo el tiempo durante el cual se estuvieron falsificando los cheques a que se contrae la reclamación, el banco demandado remitió al demandante, mensualmente, según su práctica y costumbre, un estado de cuenta. Estos estados de cuenta llegaban al demandante a principios de cada mes. Portilla recibió los estados de cuenta correspondientes a todos y cada uno de los meses comprendidos dentro del término durante el cual se pagaron y cobraron los cheques falsificados, a excepción del correspondiente al mes de diciembre de 1942, el cual debió llegar a él a principios de enero de 1943. Con los estados de cuenta, el banco demandado remitía al demandante los che-

ques cancelados que habían sido pagados durante el mes a que correspondía cada estado de cuenta.

"Durante el término que comprende los meses en que se pagaron por el banco demandado los cheques falsificados, los Estados de cuenta mensuales se remitieron al demandante en tres formas distintas. Primero por mensajero, que entregaba los estados de cuenta a cualquier persona en el establecimiento de Portilla, firmando esta persona una libreta en señal de recibo; luego los mismos se entregaban en el banco a Teodomiro Rangel, y a partir del mes de junio de 1942, a solicitud del demandante se enviaban por correo. La actuación de Rangel recogiendo los estados de cuenta en el banco era conocida de Portilla y estaba consentida y aprobada por él. Los estados de cuenta remitidos por correo los recogía Portilla personalmente en el apartado o los recogía cualquier empleado suyo a quien él daba la llave del apartado para recoger la correspondencia.

"El demandante nunca examinó los estados de cuenta que recibía del banco demandado. Esa misión le estaba encomendada por él a su contable Teodomiro Rangel. Tampoco supervisaba la revisión de los mismos. En raras ocasiones Portilla personalmente examinó los estados de cuenta que le enviaba el banco demandado, pero cuando así lo hacía era al único propósito de determinar si existía un balance a su favor que le permitiera girar contra la misma. La gran mayoría de los estados de cuenta permanecían en el escritorio del establecimiento comercial del demandante, sin abrir, hasta que llegara Rangel a abrirlos y a hacer la reconciliación correspondiente.

"Fué examen muy ocasional y por demás superficial y la absoluta confianza de Portilla en Rangel y la admitida ignorancia del demandante en materia de contabilidad lo que hizo que el demandante no notara los cheques falsificados devueltos con sus estados de cuenta, si es que en alguna ocasión Portilla examinó el balance de su cuenta antes de haber Rangel sustraído los cheques falsificados; y sin duda alguna fué ese examen muy ocasional y por demás superficial lo que hizo que el demandante no notara al examinar sus estados de cuenta para comprobar si todos los cheques girados habían sido pagados, si es que en algún momento hizo tal comprobación, a lo cual no damos crédito, que en sus estados de cuenta aparecían más cargos que cheques devueltos.

"Teodomiro Rangel encubrió las falsificaciones descontando el importe de los cheques falsificados de las ventas, o sea, en-

trando menos dinero en los libros que las cantidades que se depositaban en el banco. En los libros de cheques de Portilla, esto es, en los talonarios presentados como prueba, Rangel deducía del balance anterior no sólo el importe de los cheques que aparecían librados según los talones, sino también el importe de los cheques falsificados. En esta forma hacía concordar el balance de los estados de cuenta con el balance de los libros de los talonarios. Cualquier examen que hubiera hecho el demandante antes de Rangel hacer tales reajustes en los talonarios con el propósito de determinar el balance a su favor en el banco, le hubiera revelado inmediatamente que el balance según sus libros de talonarios era superior al balance según los estados de cuenta por el montante de los cheques falsificados. Así sucedió cuando Portilla personalmente, a pesar de su admitida ignorancia en materia de contabilidad, revisó su libro talonario de cheques al tener aviso del banco sobre un sobregiro. No podemos llegar a otra conclusión que no sea la de que el demandante nunca examinó sus libros de talonarios en relación con los balances que le informaba el banco en los estados de cuenta mensuales y que únicamente examinó los estados de cuenta que le rendía el banco al propósito de determinar si el banco le informaba un balance a su favor que le permitiera girar contra su cuenta corriente.

"Para cambiar los cheques falsificados en el banco demandado Rangel utilizó los servicios de su cuñado Juan Bautista Iglesias. Rangel le pagaba por cambiar los cheques dándole dinero cada vez que cambiaba uno. Iglesias cambiaba los cheques en el banco demandado sin dificultad alguna. La mayor parte de los cheques falsificados fueron pagados en el banco demandado por el pagador Fernando Conde; algunos lo fueron por el pagador José Antonio Combas y otros por distintos pagadores del banco. En ningún momento pidieron los pagadores del banco a Iglesias que se identificara, lo cual no hicieron por estar los cheques librados [al portador]. Cuando los pagadores le pedían a Iglesias que endosara los cheques, éste lo hacía firmando Juan López Díaz o Juan I. Díaz. El pagador Combas, único de los pagadores que conocía a Iglesias personalmente y sabía su nombre, le cambió siempre los cheques sin endoso alguno. Ni los pagadores de los cheques, ni Fernando Fernández, (tenedor de libros) a cargo de la cuenta de A. Portilla & Co., tuvieron duda en momento alguno en cuanto a la legitimidad

y la genuinidad de la firma de Portilla en los cheques que dieron lugar a la reclamación del demandante.

"Las actuaciones de Rangel e Iglesias en relación con la falsificación y cobro de los cheques no eran conocidas de los oficiales y empleados del banco demandado ni resulta de la prueba motivo alguno para creer que lo fueran del demandante, Ángel Portilla. En las ocasiones en que los empleados del banco demandado entregaron los estados de cuenta del demandante a Rangel y a Iglesias, lo hicieron por razón del conocimiento que tenían de la relación existente entre Portilla y su contable, Teodomiro Rangel y por razón, además, de que en ningún momento el demandante formuló protesta o reclamación.

"El fraude de Rangel y su cuñado Iglesias se descubrió allá para el día 19 de enero de 1943, al surgir un sobregiro en la cuenta corriente de A. Portilla & Co. en el banco demandado. Al originarse el sobregiro, el demandante recibió un aviso por teléfono y al acudir éste al banco, reclamó que tenía un balance a su favor de Mil Cuatrocientos Dólares ($1,400) o Mil Quinientos Dólares ($1,500). De un examen que hicieron el demandante y Rafael Gilestra, empleado del banco demandado, del libro de talonarios del demandante, en cuanto al mes de diciembre de 1942, resultó que los talonarios demostraban una diferencia de dos mil y pico de dólares a favor de Portilla en comparación con su cuenta en el banco. Asimismo, de un examen de los cheques pagados contra la cuenta de Portilla en el mes de diciembre de 1942, resultó que el demandante señaló cuatro que alegó que no habían sido ni expedidos ni firmados por él. A estos hechos siguió una investigación de toda la contabilidad del demandante que él encomendó a la firma de contables de Gonzalo Aponte y la determinación por parte de los contables de la forma en que Rangel encubrió las falsificaciones, así como el montante pagado por el banco demandado por concepto de cheques falsificados.

"El demandante necesitó que el banco demandado le facilitara toda la documentación necesaria para que los contables pudieran hacer la investigación que les había encomendado, ya que Portilla había destruído la mayor parte de los estados de cuenta que le había remitido el banco demandado durante los años 1941, 1942 y 1943; había destruído la mayor parte de los originales de los cheques por él expedidos durante esos años, y los cheques falsificados habían sido destruídos por Rangel. El banco demandado suministró al demandante copia de todos

los estados de cuenta correspondientes al año mencionado y mostró parte de los cheques falsificados a él y al contable José Díaz Santiago en un sistema de fotografías que operaba el demandado desde mayo de 1941.

"Para la fecha a que se refieren los hechos del caso, el banco demandado seguía un sistema para la preparación de sus pagadores y para el cotejo de firmas luego de pagados los cheques de sus cuentacorrentistas. Antes de ser asignados a las ventanillas de pago todos los pagadores pasan por un período de entrenamiento en varios departamentos, especialmente en el departamento de cuentas corrientes. Los pagadores, usualmente muchachos jóvenes, empiezan como mensajeros o ayudantes en un departamento cuando empiezan a trabajar en el banco demandado. Luego, en el departamento de cuentas corrientes desempeñan cargos donde se sortean cheques para archivarlos en la cuenta correspondiente y trabajan como tenedores de libros, anotando depósitos y cargando los cheques pagados en las cuentas de los cuentacorrentistas. Aun antes de estar en los archivos de los cheques, que es la primera posición que desempeñan en el departamento de cuentas corrientes, pasan un tiempo aprendiendo a conocer la firma de los clientes del banco. Como tenedores de libros trabajan año o año y medio, antes de pasar a las ventanillas de pago, como sucedió en los casos de Fernando Conde y José Antonio Combas, quienes pagaron la mayor parte de los cheques falsificados cuyo importe se reclama en este caso. Tanto en el archivo de cheques, como cuando actúan como tenedores de libros, los empleados se familiarizan y aprenden a conocer las firmas de los clientes del banco. Por las manos de todos los empleados, archiveros, tenedores de libros y pagadores, pasan los cheques que se pagan contra las cuentas corrientes; todos ellos tienen la obligación de examinar las firmas, y en caso de duda referirse al tarjetero o consultar los oficiales.

"La sucursal de San Juan del Crédito y Ahorro Ponceño y la sucursal de San Juan del Royal Bank of Cánada, tienen en práctica iguales sistemas que el banco demandado.

"El primer aviso que tuvo el banco demandado al efecto de que se estaban pagando cheques falsificados contra la cuenta de A. Portilla & Co. fué cuando el propio demandante, en 19 de enero de 1943, señaló a Rafael Gilestra, empleado del demandado, cuatro cheques que alegó no habían sido firmados por él.

A partir de esa fecha nunca más pagó el banco demandado cheques falsificados contra la cuenta corriente del demandante."

Como fundamentos de derecho para su sentencia, el juez del tribunal a quo expuso, en síntesis, los siguientes:

1.—Que a los bancos se les requiere que conozcan las firmas de sus depositantes y que pueden pagar, con cargo a ellos, únicamente los cheques que lleven sus firmas legítimas. .

2.—Que la relación entre un banco y la persona que deposita dinero en cuenta corriente es una de deudor y acreedor.

3.—Que, no obstante, en las relaciones entre un banco y su cliente cuentacorrentista existe mutualidad de obligaciones. El depositante tiene la obligación ineludible de examinar sus estados de cuenta e informar al banco errores o irregularidades dentro de un término razonable. Asimismo, el depositante tiene el deber ineludible de supervisar las actuaciones de sus empleados si esas funciones se delegan en ellos.

4.—La obligación del depositante de examinar sus estados de cuenta e informar al banco errores e irregularidades existe como obligación de origen legal, aun cuando no exista obligación al efecto de origen contractual. Es regla de derecho que nació del uso y la costumbre en los negocios y las relaciones entre los bancos y sus depositantes, aconsejada por la prudencia y buen sentido de rectitud en las operaciones comerciales.

5.—El término de diez días, señalado en los estados de cuenta remitidos por el banco demandado al demandante, es un término razonable para el cumplimiento de la obligación de examinarlos.

6.—La revisión de los estados de cuenta por el depositante debe incluir: (a) cotejo de los cheques devueltos con el libro talonario; (b) comparación del balance del estado con el de los libros del depositante; y (c) cotejo de los cheques devueltos con la relación de cheques que aparece del estado de cuenta.

7.—Si el depositante hace una revisión cuidadosa de sus estados de cuenta que comprenda los cotejos y comparaciones, y no encuentra error o equivocación alguna, debe estimarse que ha sido diligente en el cumplimiento de su obligación. Por el contrario, si omite estos cuidados debe estimarse que ha sido negligente en el cumplimiento de su obligación.

8.—La designación de empleados de confianza para hacer la revisión de los estados de cuenta no releva al depositante de

toda ulterior obligación. El depositante tiene la obligación de supervisar las actuaciones de sus empleados de confianza cuando tales actividades o funciones se delegan en los empleados, y al depositante se le imputa el conocimiento, aun cuando no del fraude de sus empleados o cualquiera de ellos, sí de aquellos errores, equivocaciones e irregularidades que apreciaría un empleado honrado al hacer una revisión de los estados de cuenta.

9.—El depositante que habiendo tenido la oportunidad de descubrir que contra su cuenta corriente se han pagado cheques falsificados (o que habiéndolo descubierto no lo notificara al banco depositario) queda impedido (*estopped*) de cuestionar la validez de cualesquiera cheques falsificados pagados por el banco depositario subsiguientemente, inducido a ello por la omisión negligente del depositante de advertir al banco las primeras falsificaciones.

10.—El depositante que habiendo tenido la oportunidad de descubrir que contra su cuenta corriente se han pagado cheques falsificados, o que habiéndolo descubierto no lo notifica al banco, incurre en negligencia, y esta negligencia constituye la causa próxima de cualquier pérdida por concepto de cheques falsificados pagados luego de rendirse el estado de cuenta que contenía los primeros cheques falsificados de la serie.

11.—El banco sólo puede levantar las defensas de negligencia y estoppel cuando está libre de negligencia. Dicha negligencia debe probarse por actos y omisiones que surjan independientemente del hecho de la violación contractual por el pago de los cheques falsificados.

12.—En el presente caso el demandante incurrió en negligencia, la cual resulta de su abandono casi absoluto de los estados de cuenta que le remitía el banco mensualmente y de su falta de supervisión de las actuaciones de su tenedor de libros. Esta negligencia "constituye la causa próxima de toda la pérdida habida por concepto de los cheques falsificados pagados por el banco demandado luego de rendido el estado de cuenta que contenía los primeros cheques falsificados de la serie. Habiendo el demandante tenido la oportunidad de descubrir que contra su cuenta corriente se estaban pagando cheques falsificados, y no habiéndolo hecho, está impedido (*estopped*) de cuestionar los pagos de cheques falsificados hechos por el banco demandado subsiguientemente, inducido a ello por la omisión negligente del demandante de advertir las primeras falsificaciones".

13.—Siendo esta una acción procedente de cheques, la reclamación del demandante está prescrita en cuanto a todos los cheques pagados más de tres años antes de la reclamación extrajudicial hecha por el demandante al banco en 11 de mayo de 1943.

En apelación, el demandante imputa al tribunal inferior la comisión de los siguientes errores:

"1.—La corte inferior erró al resolver que el demandante-apelante había incurrido en negligencia cuando, habiendo tenido la oportunidad de descubrir que contra su cuenta corriente se habían pagado cheques falsificados, o habiéndolo descubierto, no lo notificó al Banco, y que dicha negligencia fué la causa próxima de toda la pérdida habida por los cheques falsificados pagados por el banco.

"2.—Aun en el supuesto de que el demandante hubiese incurrido en negligencia al no descubrir las falsificaciones y así comunicárselo al Banco, la corte inferior erró al no resolver que el banco demandado había incurrido en negligencia para con el demandante, y que le incumbía a dicho banco demandado probar, por medio de una defensa afirmativa, que estaba totalmente libre de toda negligencia como condición precedente a levantar la negligencia del demandante.

"3.—La corte inferior erró al resolver, como cuestión de derecho, que el depositante de un banco tiene el deber ineludible de supervisar las actuaciones de sus empleados en el examen de sus estados de cuenta si esas funciones se delegan en ellos.

"4.—La corte inferior erró al resolver, como cuestión de derecho, que el depositante que habiendo tenido oportunidad de descubrir que contra su cuenta corriente se han pagado cheques falsificados, no lo notifica al banco depositario, queda impedido (*estopped*) de cuestionar la validez de cualesquiera cheques falsificados pagados por el banco depositario subsiguientemente.

"5.—La corte inferior erró al resolver que la reclamación del demandante está prescrita en cuanto a todos los cheques falsificados pagados más de tres años antes del requerimiento extrajudicial hecho por el apelante al apelado el 11 de mayo de 1943.

"6.—La corte inferior erró al imponerle al demandante la obligación de pagar los honorarios de abogado del demandado;

y aun suponiendo que estuviese justificada en ello, la suma de mil dólares asignada para tales fines es excesiva y exagerada, todo lo cual constituye un claro abuso de discreción."

■ Antes de iniciar la discusión de los errores señalados, se hace preciso el determinar la naturaleza de la relación o vínculo jurídico que surge entre un banco y un depositante o cuentacorrentista. Nuestra Ley de Bancos no define esa relación, ya que ella se limita a la reglamentación del aspecto jurídico-administrativo de los bancos, en cuanto a sus requisitos orgánicos y las normas de interés público por las que han de regirse, dejando fuera de su ámbito el régimen de los contratos y sus relaciones privadas. Garrigues, Tratado de Derecho Mercantil, tomo I, pág. 87. Pero nuestro Código Civil caracteriza el contrato envuelto en el establecimiento de una cuenta corriente como uno de préstamo, y no meramente de depósito, ya que el banco depositario tiene, además de su obligación de guardar y restituir el dinero depositado, o su valor, la facultad de servirse o usar de la cosa depositada. Artículos 1631 y 1668 del Código Civil; artículo 227 del Código de Comercio; *Tesorero de P. R.* v. *Banco etc., y Manrique, Int.,* 46 D.P.R. 308; 2, Benito, Derecho Mercantil, pág. 464 *et seq;* Manresa, Comentarios al Código Civil, tomo 11, pág. 687, 5ta. ed.; 3 Castán, Derecho Civil Español, pág. 303, 304; 3 Valverde, Tratado de Derecho Civil Español, pág. 528, 3ra. ed; Planiol y Ripert, Tratado Práctico de Derecho Civil Francés, tomo 11, pág. 452–453: "el depositante pierde la propiedad de las sumas depositadas; no hay ya, como en el depósito verdadero, un derecho de reivindicación del objeto depositado, sino solamente un derecho de crédito contra el depositario, como en caso de préstamo de consumo"; 4 Colin y Capitant, Curso Elemental de Derecho Civil, pág. 550; Sentencia del Tribunal Supremo de España de 24 de noviembre de 1943, siendo magistrado ponente el ilustre civilista Castán. El mismo criterio se ha seguido en Filipinas, aplicándose artículos del Código de Comercio idénticos a los 227 y 228 del

nuestro: *In re Liquidation of the Mercantile Bank of China,* 65 Phil. 443, 451. La consideración de tal relación como una que da lugar a un contrato de préstamo guarda similitud con la regla prevaleciente en los Estados Unidos al identificar tal vínculo como un deudor y acreedor. *Tesorero de P. R.* v. *Banco, etc. y Manrique, Int.,* supra; Mitchie, *Banks and Banking,* vol. 5A, capítulo 9, sección 1, pág. 1 *et seq;* Gay de Montellá, Comentarios al Código de Comercio, tomo 2, pág. 393; *Gullas* v. *Banco Nacional,* 62 Jur. Fil. 558, 561; *San Carlos Milling Co.* v. *Banco de las I. F.,* 59 Jur. Fil. 62.

El banco depositario está obligado a pagar al depositante la deuda que pueda surgir del préstamo envuelto. Bajo el artículo 1116 de nuestro Código Civil, aplicable al contrato en discusión, el banco demandado en el caso de autos estaba obligado a verificar el pago al acreedor o depositante o a la persona debidamente autorizada por él para recibir el pago. Estaba obligado contractualmente a cargar a cuenta del depositante solamente aquellos pagos hechos bajo la firma auténtica y verdadera del depositante, o sea, al propio depositante o a la persona autorizada por el depositante para recibirlos. Esta regla coincide con el principio adoptado por los tribunales de los Estados Unidos. *American Sash & Door Co.* v. *Commerce Trust Co.,* 56 S. W. 2d 1034; *First Nat. Bank of Weslaco* v. *Patty,* 62 S. W. 2d 629; *Defiance Lumber Co.* v. *Bank of California,* 41 P. 2d 135. Un banco está obligado a conocer la firma de sus depositantes y, cuando paga un cheque falsificado, el pago no responde a la autorización auténtica del depositante. *Herbel* v. *Peoples State Bank of Ellinwood,* 228 P. 2d 929; *Bank of New York* v. *Public Nat. Bank & Trust Co.,* 92 N.Y.S. 2d 620; *Interstate Hosiery Mills* v. *First Nat. Bank,* 11 A. 2d 537.

En la sentencia del Tribunal Supremo de España de 28 de febrero de 1896, se resuelve que el artículo 1162 del Código Civil de España, correspondiente al 1116 nuestro, impone al deudor, que en este caso es el banco demandado, la obligación de pagar los talones de cuenta corriente, al mismo

cuentacorrentista, acreedor o a quien autorice, obligación que no se extingue con el pago hecho a un tercero que carecía de aquella precisa autorización. Véase además, Manresa, ob. cit., tomo 8, pág. 536.

Ahora bien, se trata, como hemos visto, del cumplimiento por el banco de una obligación contractual de pagar o restituir lo que se ha entregado en calidad de préstamo. El incumplimiento de esa obligación puede producir consecuencias legales sin que sea necesario demostrar que el banco ha sido negligente. La situación no está gobernada por conceptos de negligencia, o sea, de culpa extracontractual, ya que la obligación del banco se deriva del contrato de préstamo en sí. Puede haber casos, como el de autos, en que la falsificación se haya hecho con un grado tal de habilidad y excelencia (o de supremacía artística) que ella no hubiera podido ser comprobada por el banco o sus empleados, por más diligencia o cuidado razonable que ellos pudiesen haber desplegado. Naturalmente, el "más exquisito cotejo" (*Cf.* Sentencia del Tribunal Supremo de España de 4 de diciembre de 1906), practicado por peritos excepcionales podría haber resultado en el descubrimiento de la falsificación, pero los principios de negligencia no se basan en normas de cuasi perfección, sino que más bien siguen un patrón de razonabilidad. El hecho en sí de ausencia de negligencia, o sea, de que el banco, a través de sus agentes o empleados, haya adoptado todas las precauciones razonables del caso y haya actuado con una diligencia y cuidado razonable en cuanto a verificar la firma, aunque infructuosamente, no lo exonera de responsabilidad si ha pagado un cheque falsificado. En ese caso el banco no ha cumplido con su obligación contractual de verificar el pago a una persona precisamente autorizada por el depositante, y ello define los contornos de la responsabilidad del banco, independientemente de conceptos de negligencia.[1]

---

[1] En algunos casos el Tribunal Supremo de España ha sugerido que la responsabilidad del banco puede basarse en conceptos de negli-

■ Ahora bien, la médula de esta acción se refiere a la conclusión formulada por el tribunal a quo al efecto de que los pagos de los cheques falsificados hechos por el banco se debieron a la propia conducta u omisión negligente del depositante demandante, al no fiscalizar ni vigilar ni supervisar adecuadamente la conducta de su empleado Teodomiro Rangel, autor de las falsificaciones y al no fiscalizar, ni inspeccionar, ni enterarse de, los estados de cuentas y cheques cancelados enviados mensualmente por el banco al depositante, y al no llamar la atención al banco, todo ello por un período de tres años, en cuanto a ciento setentiún cheques que envolvían la suma de $26,139.39. Portilla, durante ese período de tiempo, nunca examinó personalmente los cheques cancelados ni los estados de cuentas, limitándose, en muy raras ocasiones, a determinar si existía algún balance a su favor. En la gran mayoría de las ocasiones Portilla ni siquiera abría los sobres que contenían los estados de cuenta y los cheques cancelados. Tal como concluyó el tribunal a quo, Rangel encubría las falsificaciones descontando el importe de los cheques falsificados de las ventas, o sea, entrando menos dinero en los libros que las cantidades que se depositaban en el banco. Portilla no examinaba sus propios libros ni comprobaba el movimiento de las ventas, en cuanto ello pudiese implicar el descubrimiento de las falsificaciones. En los talonarios de los libros de cheques Rangel deducía del balance anterior no sólo el importe de los cheques que aparecían librados según los talones, sino que también el importe de los cheques falsificados y en esa forma hacía concordar el balance de los estados de cuenta con el balance de los libros de talonarios. Tal como concluyó el tribunal sentenciador, "cualquier examen que hubiera hecho el demandante antes de Rangel hacer tales reajustes en los talonarios con el propósito de determinar el balance a su favor en

gencia. Véanse sentencias de 3 de febrero de 1927 y de 4 de diciembre de 1906. Por lo arriba expuesto, entendemos que se trata de una obligación contractual, que no se basa en culpa o negligencia.

el banco, le hubiera revelado inmediatamente que el balance según sus libros de talonarios era superior al balance según los estados de cuenta por el montante de los cheques falsificados". Pero Portilla no se ocupó personalmente, en momento alguno durante tres años, de hacer tales verificaciones. Todo se lo encomendó a Rangel, el propio falsificante. Se trataba de una desidia extraordinaria de Portilla, de una indiferencia rayana en pasividad casi absoluta, de una despreocupación que colindaba con la inconsciencia en cuanto a sus propios asuntos económicos, y en cuanto a la vigilancia de sus empleados, en que Portilla se inmunizaba a sí mismo de su situación económica, y de la conducta de sus agentes, no debido precisamente a incompetencia ni a normas deliberadas de estoicismo sino a una actitud de excesiva confianza en Teodomiro Rangel. Todo ello significa negligencia de crasa magnitud de parte de Portilla, y esa negligencia facilitó notablemente el fraude perpetrado. Tal como ha resuelto el Tribunal Supremo de España en sus sentencias de 4 de diciembre de 1906 y de 28 de febrero de 1896, bajo circunstancias análogas a las del caso de autos (pago por un banco de cheques falsificados), el depositante no puede recobrar del banco bajo tales circunstancias si él ha cometido un acto de omisión o negligencia que haya facilitado el fraude o si los pagos se han verificado debido a la culpabilidad del depositante, que origine responsabilidades a él mismo imputables. La pasividad y el silencio del depositante en el caso de autos, y su falta de vigilancia de Rangel, o sea, la negligencia del depositante, fué una causa efectiva y predominante de la conducta del banco al pagar los cheques falsificados. Examinemos los principios legales aplicables.

■■ El artículo 24 de la Ley de Instrumentos Negociables de Puerto Rico (artículo 376 del Código de Comercio, y que equivale a la sección 23 de la Ley Uniforme de Instrumentos Negociables), dispone lo siguiente:

"Cuando se falsificare una firma o se hiciere sin autorización de la persona de quien se supone que procede la firma, no

tendrá efecto alguno, ni se adquirirá, en virtud de ella, derecho alguno para retener el documento o para cancelarlo o para obligar al pago del mismo a cualquiera de las partes que en él figuren, a menos que la parte contra quien se tratare de hacer valer tal derecho estuviere impedido para alegar en su defensa la falsedad o falta de autorización."

Bajo el texto citado, un banco no puede adquirir derecho alguno frente a un depositante cuando ha pagado un cheque en que la firma de éste ha sido falsificada, a menos que el depositante esté "impedido para alegar en su defensa la falsedad o falta de autorización". Véase la extensa anotación en 146 A.L.R. 840. La Ley de Instrumentos Negociables no define las circunstancias en que pueda surgir tal impedimento, pero la palabra "impedido" (*precluded*) usada en el artículo 24, se ha interpretado como identificada con el concepto de "estoppel". *Union Trust Co.* v. *Soble*, 64 A.2d 744; *Citizens' Union Nat. Bank* v. *Terrell*, 50 S.W.2d 60; *National Deposit Bank of Owensboro* v. *Ohio Oil Co.*, 62 S.W.2d 1048; *Scott* v. *First National Bank in St. Louis*, 119 S.W.2d 929. Los tribunales estadounidenses han reconocido varias circunstancias en que una persona puede quedar impedida de levantar como defensa la falsificación de su firma en un instrumento negociable. Por ejemplo, cuando ha admitido la genuinidad de la firma o de su responsabilidad bajo el instrumento. *Marsh* v. *State Bank & Trust Co.*, 284 S.W. 380; *Negim* v. *First State Bank of Picher*, 49 P.2d 763; *Horn* v. *Nicholas*, 201 S.W. 756. Igual efecto tiene una promesa de pagar a sabiendas de la falsificación, (48 A.L.R. 1370) o cuando media una adopción de la firma falsificada (48 A.L.R. 1374). También surge el impedimento cuando se reciben los beneficios del pago del documento, a pesar de la falsificación. *Embry* v. *Long*, 75 S.W.2d 1036. El silencio o dilación injustificada en informar la falsificación una vez descubierta, (25 A.L.R. 177 y 50 A.L.R. 1374) también se ha reconocido como causa de *estoppel* en este sentido. Igual efecto tiene el poner en circulación el documento,

(*Weyauwega* v. *Ayling*, 99 U.S. 112) o renovar el mismo (*Firs State Bank* v. *Williams*, 121 N.W. 702; 35 A.L.R. 1282; 72 A.L.R. 604, 609). Finalmente, se es responsable por los actos negligentes que conlleven la circulación del documento negociable. *Northern Pac. Ry. Co.* v. *Spokane Valley Growers' Union*, 232 Pac. 691.

Los tribunales americanos han aplicado la doctrina de *estoppel* en estos casos, siendo la doctrina mayoritaria al efecto de que cuando un banco paga cheques en que la firma del depositante ha sido falsificada, la pérdida debe ser sufrida por el depositante si él ha sido negligente en descubrir o notificar al banco las falsificaciones. Mitchie, ob. cit., vol. 5b, sección 283, pág. 121. Este concepto de negligencia se basa en la imputación de un deber, de parte del depositante, de examinar los estados de cuenta que periódicamente le remita el banco, debiendo además informar, dentro de un término razonable, cualquier dato que descubra indicativo de que su firma ha sido falsificada. 60 Harv. L. Rev. 59; *Leather Manufacturers' Nat. Bank* v. *Morgan*, 117 U.S. 96, 29 L. ed. 811; *First Nat. Bank* v. *Farrell*, 272 Fed. 371; *Takenaka* v. *Bankers Trust Co.*, 132 Misc. Rep. 322; *Worthen Bank & Trust Co.* v. *Kelley-Nelson Const. Co.*, 245 S.W.2d 405; *Herbel* v. *People's State Bank*, supra.

La omisión de notificar al banco cualesquiera cargos impropios, por razón de no haber examinado el depositante los estados de cuenta, constituye una defensa para el banco. *Maryland Casualty Co.* v. *Central Trust Co.*, 51 N.Y.S.2d 65; *Screenland Magazine, Inc.* v. *National City Bank of New York*, 42 N.Y.S.2d 286; *Basch* v. *Bank of America Nat. Trust & Savings' Ass'n.*, 139 P.2d 1; *Morgan* v. *United States Mortgage & Trust Co.*, 101 N.E. 871. En cuanto a una serie de falsificaciones, existe una relación de causalidad entre la omisión del depositante de examinar los estados de cuenta y el pago de esos cheques, ya que el descubrimiento del fraude hubiera puesto al banco en posición de evitar los pagos subsiguientes de cheques falsificados, y el banco se

hubiera "puesto en guardia" contra futuras tentativas para cobrar cheques falsificados. *Critten* v. *Chemical National Bank*, 63 N.E. 969; *Israel* v. *State Nat. Bank*, 50 So. 783; Arant, "Forged Checks—The Duty of the Depositor to his Bank", 31 Yale L. J. 598, 623. Bajo tales circunstancias, el banco ha sido inducido a pagar como consecuencia del silencio y de la inacción del depositante. *First Nat. Bank* v. *Allen*, 14 So. 335, 338. Véanse además *Worthen Bank & Trust Co.* v. *Kelley-Nelson Const. Co.*, supra; *Interstate Hosiery Mills* v. *First Nat. Bank*, supra; *Union Trust Co.* v. *Soble*, supra. Véanse además, sobre esta cuestión, 4 Williston *on Contracts*, ed. revisada, sec. 1145, pág. 3292 y anotaciones en 15 A.L.R. 159; 67 A.L.R. 1121; 103 A.L.R. 1147.

■ En cuanto a contratos en general, la regla prevaleciente en los Estados Unidos es al efecto de que su cumplimiento puede ser excusado por aquella conducta o inacción del acreedor que equivalga a un impedimento en equidad (*equitable estoppel*). 31 C.J.S. 439, sec. 151; Pomeroy's *Equity Jurisprudence*, vol. 3, pág. 208, sec. 808a; cf. Corbin *on Contracts*, vol. 3, pág. 913, sección 754.

■ En los Estados Unidos tres doctrinas se han enunciado como base de exoneración del banco cuando el pago al falsificador ha sido inducido por la inacción negligente del depositante, partiendo las tres doctrinas del común supuesto de la obligación del depositante de examinar los estados de cuenta y los cheques cancelados que le remita el banco, siendo ellas tres la de "estoppel" a base de negligencia que ya hemos discutido, la de ratificación o adopción y la de incumplimiento de un deber contractual implícito. En cuanto al concepto de ratificación se ha indicado por algunas cortes y comentaristas que el silencio posterior del depositante implica una ratificación tácita de los pagos de cheques falsificados. Britton, *on Bills and Notes*, pág. 597; Brannan's *Negotiable Instrument Law*, pág. 336. Tal doctrina ha sido criticada, ya que el falsificador no ha actuado ni siquiera con la autorización

aparente del depositante, no siendo ratificable su actuación. Williston, *on Contracts*, sec. 1145, pág. 3290–91, ed. rev.; *cf.* *No Dust O Co.* v. *Home Trust Co.*, 46 S.W.2d 203; *Magid* v. *Drexel Nat. Bank*, 71 N.E.2d 898; *Fourth & Central Trust Co.* v. *Johnson*, 156 N.E. 462; *First Nat. Bank* v. *Allen*, supra; y véase la anotación en 150 A.L.R. 978. Debemos observar que bajo esta doctrina se trataría de una ratificación tácita a base de un conocimiento implícito, constituyendo ello una base anómala para la exoneración del banco, aunque el resultado sea justo. Arant, "Forged Checks— Duty of the Depositor to his Bank", 31 Yale L. J. 598.

En cuanto a cuál deba ser la doctrina legal prevaleciente en Puerto Rico con respecto a las consecuencias de la conducta del depositante al no examinar ni fiscalizar los estados de cuenta a él enviados, es indudable que el depositante no tiene el deber contractual expreso de examinar tales estados de cuenta, ya que él expresamente no asumió esa obligación. Sin embargo, desde el punto de vista realista y funcional, la estabilidad en las relaciones bancarias y los principios inmanentes de justicia y razonabilidad imponen al depositante el deber de examinar y fiscalizar tales estados de cuenta ya que el depositante tiene la oportunidad continua de evitar que el banco pueda seguir asumiendo los riesgos de repetidas falsificaciones. Tal deber del depositante no ha sido señalado contractualmente en forma expresa ni en virtud de disposición específica alguna de ley. Pero, desde el punto de vista de los principios de equidad que pueden ser aplicables en ausencia de ley, desde el punto de vista realista y los usos y costumbres prevalecientes en las relaciones entre los bancos y sus clientes, el depositante está bajo una obligación contractual implícita de verificar tal examen y fiscalización y por los usos y costumbres comerciales y bancarios prevalecientes en la comunidad pueden surgir obligaciones contractuales implícitas y pueden ser consideradas como una parte tácita del contrato. De acuerdo con el artículo 2 de nuestro Código de Comercio los actos de comercio se regirán por las

disposiciones en él contenidas; y, en su defecto, por los usos del comercio observados generalmente en cada plaza y, a falta de ambas reglas, por las del derecho común.

En Garrigues, ob. cit., tomo 1, pág. 143, se señala la importancia de los usos en las relaciones mercantiles en la forma siguiente:

"Históricamente, el uso ocupa el primer rango en las fuentes del Derecho Mercantil. En la Edad Media el tráfico mercantil se regulaba predominantemente por usos recogidos en los Estatutos de las Corporaciones. En todo tiempo la legislación mercantil ha sido en su mayor parte compilación y revisión de usos. El artículo 20 del Reglamento de 8 de febrero de 1927 imponía al Consejo Superior Bancario la obligación de recoger las costumbres y usos mercantiles a los efectos del artículo 2º de nuestro C. de c. Y conforme el artículo 8º del Reglamento de Cámaras de Comercio de 26 de julio de 1929 estos organismos deben ser oídos necesariamente sobre los usos y prácticas mercantiles en las plazas de su territorio.

"La formación del Derecho mercantil, como una desviación especial del Derecho civil, explica la importancia del uso. Cuando la ley civil no se adaptaba a las peculiares exigencias del tráfico mercantil, los comerciantes no se cruzaban de brazos esperando una ordenanza legal adecuada, sino que se separaban en seguida de la aplicación de la ley por medio de usos extra legem, adecuados a sus especiales finalidades económicas. El Derecho Mercantil no nace legislativamente, sino por la fuerza del uso. El rápido curso del comercio exigía un Derecho preferentemente elástico que se amoldase a los más ligeros matices de necesidades siempre cambiantes; un Derecho dinámico, vivo en la práctica; no un Derecho estático, muerto en los Códigos. El uso mercantil se manifiesta, pues, como una reacción de los comerciantes contra la aplicación del Derecho civil en aquellos contratos mercantiles que tenían también su correspondiente regulación civil. De otra parte, en las instituciones genuinamente mercantiles (letra de cambio, sociedades de comercio, seguros, cuenta corriente, mediación, contratos marítimos . . .) fué el uso mercantil quien hubo de regularlas en su forma y en sus efectos modificando y adaptando, según las necesidades del comercio, los principios tradicionales del Derecho civil. Nace así la regla, que hoy todavía se conserva en

el artículo 2º de nuestro C. de c., de que la costumbre y el estilo de los comerciantes debe prevalecer sobre el Derecho común."

El uso es aquella norma jurídica producida espontáneamente en la vida del comercio y aplicada de un modo general, continuo y persistente, a base de requisitos de necesidad y bondad, basándose la necesidad en la ausencia de ley específica, y la bondad, en la utilidad mercantil y justicia del uso. Benito, ob, cit., pág. 239, 240 et seq. Los usos deben ser observados en la práctica como regla de derecho. Gay de Montellá, ob. cit., pág. 24. Con respecto a contratos, el uso es supletorio y sirve para interpretar cláusulas dudosas o para suplir las que se omiten, si son necesarias para que se lleve a efecto lo contratado. Benito, ob. cit., pág. 250.

▬▬▬▬ Este Tribunal toma conocimiento judicial de la práctica de los bancos de enviar mensualmente estados de cuenta y cheques cancelados a sus depositantes. Véase la anotación: "Judicial Notice of Banking Customs", 89 A.L.R. 1336, 1354 y véase además 8 A.L.R.2d 446 y *Morgan* v. *U.S. Mortgage & Trust Co.*, supra. Consideramos que esa práctica debe tener algún propósito real y efectivo, cual es el de que la documentación sea examinada y fiscalizada por el depositante, a los fines de que el banco sea informado sobre alguna posible irregularidad. Como cuestión de realidad, es generalmente conocido que un banco tiene que realizar continuamente una multiplicidad de operaciones en cuanto al cambio de cheques. Es impracticable que en cada cheque se haga "un exquisito cotejo con peritos excepcionales". Es razonable, dentro de las realidades mercantiles, el que un banco trate de lograr protección contra errores en que no medie negligencia mediante la práctica de envíos de estados de cuenta y cheques cancelados a los depositantes para su examen y fiscalización. No sería justo y razonable el que un banco asuma la totalidad de los riesgos en cuanto al pago de cheques falsificados, en virtud de errores que pueden ser naturales en el curso ordinario de los negocios debido pre-

cisamente a la multiplicidad de operaciones bancarias. De ahí la necesidad y la bondad de la práctica de envíos, examen y fiscalización de estados de cuenta, a los fines de "llevar a efecto lo contratado", o sea, para que el banco esté en condiciones aptas para efectuar los pagos al depositante o a la persona debidamente autorizada por él. De ahí también la equidad envuelta en el asunto, que determina la creación de un deber contractual implicado del depositante de examinar los estados de cuenta e informar al banco sobre posibles irregularidades. El depositante debe cooperar en el descubrimiento del fraude. Él ha tenido la oportunidad de evitar la continuación en las falsificaciones, y él ha debido hacer uso de esa oportunidad.

Las cortes de la Gran Bretaña han establecido una doctrina contraria a la prevaleciente en los Estados Unidos y a la que estamos aquí adoptando. En los casos resueltos por el King's Bench Division, de *Lewis Sanitary Steam Laundry Co.* v. *Barclay & Co.*, (1906); *The Kepitigalla Rubber Estates, Ltd.* v. *The National Bank of India*, (1909) y *Walker* v. *Manchester & Liverpool District Bank*, (1913), se decidió que, en casos de falsificación de cheques, no es deber del cliente el evitar futuras falsificaciones ni el de examinar los documentos enviados periódicamente por el banco, no siendo aplicable, por lo tanto, la doctrina de *estoppel* por negligencia, y que, en segundo término, la omisión del depositante en cuanto a examinar tales documentos e informar al banco sobre ellos, no fué una causa efectiva y afirmativa de las futuras falsificaciones, sino que, a lo sumo, sirvió de ocasión o condición pasiva, aunque fuese *sine qua non*, de tales falsificaciones posteriores. No estamos conformes con el ilustrado tribunal británico. Ya hemos señalado las razones por las cuales, a nuestro juicio, surge un deber de parte del depositante de examinar y fiscalizar los estados de cuenta y cheques falsificados enviados por el banco. En cuanto al problema de causación, bajo nuestro derecho civil una omisión puede ser causa de responsabilidad. El silencio o la

pasividad pueden dar lugar a un *estoppel*.  Las omisiones del depositante en el caso de autos sirvieron de causa efectiva para inducir al banco a continuar cambiando cheques falsificados, ya que al banco nunca se le puso en guardia sobre las continuadas irregularidades. *Goldsmith* v. *Atlantic Nat. Bank of West Palm Beach*, 55 So.2d 804; *Foutch* v. *Alexandria Bank & Trust Co.*, 149 S.W.2d 76.

En síntesis, los usos y costumbres bancarios imponen sobre el depositante el deber contractual implícito y la obligación en equidad de examinar y fiscalizar los estados de cuenta y cheques cancelados enviados a él mensualmente por el banco.  En el caso de autos el incumplimiento por el depositante de ese deber fué la causa efectiva y predominante del pago continuo y repetido por el banco de los cheques falsificados y el depositante no puede requerir del banco las sumas así pagadas, ya que tales pagos fueron causados por la conducta del propio depositante al dejar de cumplir con esa obligación contractual implícita.

Ahora bien, hubo tres cheques falsificados durante el primer mes del período de tiempo envuelto en este litigio, o sea, durante el mes de enero de 1940, ascendentes dichos cheques, en total, a $630.68, habiendo sido hechas esas falsificaciones antes de enviarse el primer estado de cuenta al depositante.  En cuanto a esos cheques no es aplicable la doctrina arriba señalada ya que el banco no fué inducido por actuación u omisión alguna del demandante a pagar esos cheques y ya que esos tres cheques no tienen relación alguna con el incumplimiento por el depositante de su deber contractual tácito de examinar los estados de cuenta.  Tal resultado en cuanto a los cheques pagados durante el primer mes, coincide con la regla mayoritaria prevaleciente en los Estados Unidos.  Britton, ob. cit., pág. 599; Woodward, "The Risk of Forgery or Alteration of Negotiable Instruments", 24 Col. L. Rev. 469, 471.

El banco demandado, invocando las disposiciones del artículo 946 del Código de Comercio, interpuso la defensa de

prescripción en el tribunal a quo con respecto a los cheques pagados con anterioridad al primero de mayo de 1940, cuya alegación incluye los cheques pagados en enero de 1940, ascendentes a la suma de $630.68. El tribunal sentenciador concluyó que, efectivamente, la acción en cuanto a esos cheques estaba prescrita. El demandante ha señalado tal dictamen como error, que debemos considerar en vista de nuestra conclusión en cuanto a la obligación del banco de pagar dichos $630.68 al depositante.

El artículo 946 de nuestro Código de Comercio determina lo siguiente:

"Las acciones procedentes de letras de cambio se extinguirán a los tres años de su vencimiento, háyanse o no protestado.

"Igual regla se aplicará a las libranzas y pagarés de comercio, cheques, talones y demás documentos de giro o cambio, y a los cupones e importe de amortización de obligaciones emitidas conforme a este Código."

Ahora bien, la reclamación de la parte demandante contra el banco en el caso de autos no procede de letras de cambio ni de documentos de giro o cambio. No se origina en cheques ni aún se basa en los cheques falsificados, ni es una acción de daños y perjuicios basada en el hecho de que se falsificaron los cheques. La acción es una general en cobro de dinero, basada en la cuenta corriente en el banco, o sea, como hemos visto, en un contrato de préstamo con el banco, de cuyo contrato surge la relación de acreedor y deudor. Se trata de hacer efectivo el pago de una deuda y de una obligación personal, bajo los artículos ya discutidos del Código Civil. Por lo tanto, no es aplicable el artículo 946 del Código de Comercio.

Interpretando el artículo 950 del Código de Comercio de España, que corresponde al 946 nuestro, Gay de Montellá, en su obra sobre el Código de Comercio, tomo 5, pág. 503–504, dice lo siguiente:

"Pero sí hay que distinguir respecto de la finalidad de la prescripción. La prescripción trienal extingue las acciones

derivadas de la cambial, pero no las acciones derivadas de las relaciones jurídicas fundamentales que los contratantes han querido revestir de la acción cambiaria. Si un préstamo queda garantizado por una cambial, prescribirán las acciones derivadas de la relación cambiaria, pero la acción derivada del contrato de mutuo permanecerá inalterable y sobrevivirá por toda su duración originaria."

En la sentencia del Tribunal Supremo de España de 17 de noviembre de 1925, citada en Gay de Montellá, ob. cit., tomo 5, pág. 502, se resuelve lo siguiente:

"Al declarar la Audiencia en el fallo recurrido que el pagaré presentado con la demanda no está comprendido en los efectos de la prescripción de la acción entablada en las disposiciones del artículo 950 del Código de Comercio, porque no se reclama única y exclusivamente en virtud del mismo, sino como procedente y representativo de otro contrato que con el pagaré se trató de asegurar y garantizar, no incidió en los errores de derecho en la apreciación de la prueba de la referencia y se ajustó en un todo a los términos de la demanda, en la que se pide el pago de la cantidad que es objeto de la misma como devolución de un préstamo consignado en las diferentes pólizas representativas de las cuentas corrientes abiertas a los demandados y reducidas a una obligación fija pagadera, precisamente a los dos meses del aviso del interesado, en virtud de la facultad que una de las condiciones de la póliza inscrita para cada cuenta corriente concede a la entidad bancaria demandante (S. 17 noviembre 1925)."

En la sentencia del mismo Tribunal de 29 de octubre de 1914 se determina, con respecto al citado artículo:

" . . no es la prescripción de tres años, sino la ordinaria del artículo 1.964 del Código Civil, la aplicable, si la acción se funda en documento que garantice al demandado como fiador que era cierta la cantidad, aunque ésta la debiera el deudor por préstamos en que para obtener la suma prestada, debían descontarse las letras de cambio."

En la sentencia del mismo Tribunal de 24 de mayo de 1928 se resuelve lo siguiente:

"Son inaplicables las disposiciones del artículo 950 (del Código de Comercio, 946 nuestro) si las cantidades pasan a ser

partidas de un contrato de cuenta corriente convenido por las partes."

No siendo aplicable, por lo tanto, el citado artículo 946, habría que atender al 940 del mismo Código de Comercio, que dispone que "las acciones que en virtud de este Código no tengan un plazo determinado para deducirse en juicio, se regirán por las disposiciones del derecho común". No habiendo plazo fijado, la acción en este caso prescribiría a los quince años, bajo el artículo 1864 de nuestro Código Civil.

No ha habido prescripción en este caso, y se cometió el error señalado, en cuanto a los $630.68 ya mencionados a que tiene derecho el demandante.

Ahora bien, de la propia discusión que hemos desarrollado en cuanto a los principios legales aplicables, surge que no hubo temeridad de parte del depositante al entablar su reclamación. Por lo tanto erró el tribunal sentenciador al condenar al demandante a pagar honorarios de abogado. Los demás errores señalados por el apelante no fueron cometidos.

*Debe modificarse la sentencia apelada al efecto de que se ordene al demandado a que pague al demandante la suma de $630.68 con los intereses que correspondan y al efecto de eliminar de la sentencia aquella parte que se refiere al pago de honorarios de abogado, debiéndose devolver el caso al tribunal sentenciador para que siga los procedimientos posteriores que no sean incompatibles con esta opinión.*

Los Jueces Asociados Sres. Sifre y Belaval no intervinieron.