P.R. TOBACCO MARKETING ASSOCIATION, demandante y recurrida, *v.* PORTO RICAN AND AMERICAN INSURANCE COMPANY, demandada y recurrente; BANCO POPULAR DE PUERTO RICO y BANCO DE PONCE, terceros demandados y recurridos.

*Número:* R-68-331      *Resuelto:* 9 de febrero de 1972

388

*Agraít Oliveras & Otero,* abogados de la recurrente; *Amancio Arias Cestero,* abogado de la recurrida; *Baragaño, Trías, Saldaña & Francis* y *Clara López Baralt,* abogados del Banco Popular de Puerto Rico; *Dubón & Dubón* y *A. Torres Braschi,* abogados del Banco de Ponce.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

La cuestión planteada en este caso exige determinar cuál de las partes debe cargar con la pérdida de $8,435 ocasionada con motivo de las falsificaciones de cheques de la recurrida realizadas por Raúl Ortiz Ramón, un empleado de ésta. El Banco de Ponce pagó y endosó dichos cheques para su cobro y acreditación a favor del Banco Popular habiendo éste cargado

las sumas de dichos cheques a la cuenta de la recurrida. Al descubrir el fraude, ésta tuvo que rembolsar el monto de estos cheques a sus deudores refaccionarios a las cuentas de los cuales los había cargado.

Ocurrida la pérdida en cuestión, la recurrida demandó a la recurrente para que le rembolsase dicha pérdida de acuerdo con el contrato de fianza en vigor entre estas partes. La recurrente entonces radicó demanda contra tercero en contra del Banco de Ponce y del Banco Popular alegando que el importe de dichos cheques fue indebido y/o negligentemente hecho efectivo por la sucursal de Cayey del Banco de Ponce el cual cobró los mismos del Banco Popular de Puerto Rico después de haber suscrito endosos en cada uno; que ambos bancos son responsables por la reclamación que le ha hecho la recurrida o por la cantidad que en definitiva la recurrente venga obligada a pagar. En su contestación, en adición a una negación de los hechos, alegó el Banco de Ponce, como defensa afirmativa, que las pérdidas en cuestión fueron el resultado de la propia negligencia de la recurrida al dejar transcurrir más de 7 meses antes de descubrir y notificar las falsificaciones no obstante haber recibido durante ese período estados mensuales del Banco Popular. El Banco Popular, en su contestación, negó los hechos y como defensa adujo la misma alegada por el Banco de Ponce. Además alegó que los cheques en cuestión fueron emitidos sin la intención de la recurrida de entregarlos a las personas a cuyo favor fueron expedidos y así equivalían a cheques pagados al portador sin requerimiento de endosos para su pago. En adición, el Banco Popular radicó una demanda contra coparte contra el Banco de Ponce en que alegó que los cheques fueron presentados en primer término y pagados por el Banco de Ponce y que en caso de declararse con lugar la demanda contra tercero, el Banco de Ponce, conforme a la garantía contraída en su endoso de dichos cheques, deberá relevar al Banco Popular de responsabilidad en cuanto a todos y cada uno de dichos cheques.

Los hechos esenciales del caso, según en parte los resume el tribunal de instancia, son los siguientes:

"1.—La demandante, la 'Puerto Rico Tobacco Marketing Cooperative Association', durante las fechas a que se refiere esta acción, tenía cuentas bancarias abiertas en el Banco Popular de P.R. y en el Banco de Ponce. La demandante hacía depósitos de dinero en su cuenta en el Banco Popular, para luego girar contra éstos a través de cheques u órdenes de pago librados por ella por conducto de agentes autorizados para tales fines. Los cheques correspondientes al área de Cayey eran pagados a través de la sucursal que tenía en dicho pueblo el Banco de Ponce, quien a su vez endosaba los cheques, para su cobro o acreditación, a favor del Banco Popular de P.R.

2.—Para las fechas en que ocurrieron los hechos que dan margen a esta acción, estaba en vigor un contrato entre las partes que obligaba a la demandada a responderle a la demandante de pérdidas que ésta pudiera sufrir como consecuencia de actos deshonestos de cualquiera de sus empleados, incluyendo: falsificación, fraude, falsa representación y otros.

3.—Entre noviembre de 1956 y julio de 1958, la demandante libró contra sus referidas cuentas bancarias más de 60 cheques u órdenes de pago, teniendo fondos suficientes, a favor de miembros o socios de la cooperativa (agricultores de Cayey dedicados a la siembra de tabaco). Todos estos libramientos fueron honrados por las mencionadas instituciones bancarias.

4.—Los referidos cheques fueron librados por la demandante con las firmas de su Presidente y su Secretario Tesorero . . . . Todos los firmantes estaban autorizados por la demandante para hacer tales libramientos y sus firmas estaban debidamente registradas en dichos bancos.

5.—Raúl Ortiz Ramón, encargado de la oficina de la demandante en Cayey, mediante falsas y fraudulentas simulaciones, obtuvo de los citados funcionarios de la demandante que expidieran las referidas órdenes de pago, creyendo éstos de buena fe que se trataban de préstamos o anticipos reales solicitados por socios de la demandante; cuando lo cierto era que Ortiz Ramón simulaba solicitudes y preparaba 'listillas' fraudulentas con el fin de obtener dichos cheques, los cuales cobraba él personalmente y los usaba para su propio beneficio.

6.—Raúl Ortiz Ramón, a sabiendas de que los beneficiarios de los expresados cheques no iban a recibir su importe, ni estaban enterados de su libramiento—aprovechándose de que éstos eran socio o miembros 'bona fide' de la sociedad demandante—urdió la descrita estratagema con el fin deliberado de defraudar a la demandante. En todos los cheques Raúl Ortiz Ramón falsificó las firmas de los beneficiarios y luego endosó las mismas con su firma para lograr que el banco los pagara. Entre la demandante y los referidos bancos se había acordado que se pasara cualquier libramiento que estuviera endosado por dicho Raúl Ortiz Ramón. El importe de dichos cheques, una vez que fueron pagados a Ortiz, se cargó a las respectivas cuentas de la demandante.

7.—El referido Raúl Ortiz Ramón se declaró culpable y admitió todos los hechos imputados en los 45 cargos que componían la acusación por falsificación que le fuera formulada; y en 17 de febrero de 1961 el Tribunal lo sentenció a cumplir una pena de uno a cinco años de presidio, sentencia que le fue suspendida. (Por algunos de los cheques falsificados no se formularon cargos por haber prescrito la acción criminal.)"

El monto de los cheques del caso fueron cargados por el Banco Popular a la cuenta de la recurrida. Como ésta había cargado la cuenta de cada tomador, como deudor refaccionario suyo, con el monto del cheque correspondiente, al descubrirse el fraude la recurrida tuvo que rembolsar a éstos lo que así les cargó mediante la acreditación correspondiente en sus cuentas con la recurrida.

Ortiz Ramón fue acusado y se declaró culpable de la falsificación de aquellos cheques con respecto a los cuales no había prescrito la acción criminal. Fue sentenciado a la pena de uno a cinco años de presidio la que le fue suspendida. Ortiz Ramón ha depositado en el Tribunal Superior la suma de $1,500 para beneficio de la recurrida.

A base de los anteriores hechos, concluyó el juez de instancia que los cheques en cuestión tienen "el concepto de documentos 'al portador'. Como tales, eran negociables meramente por la entrega.", de manera que el pretendido endoso de los mismos por Ortiz Ramón era innecesario y superfluo; que la

falsificación del endoso no tenía efecto en ley alguno. En tal virtud condenó a la recurrente a satisfacer a la recurrida la suma de $8,435 y $1,000 de honorarios de abogado y declaró sin lugar las demandas de tercero, condenando a la recurrente a pagar $1,000 de honorarios de abogado a cada uno de los bancos más las costas e intereses legales sobre ambas sumas desde la fecha de la radicación de la demanda.

Apunta la recurrente que los cheques en cuestión eran "instrumentos expedidos a la orden" siendo, por lo tanto necesario, además de la entrega, un endoso válido del tomador; que el tribunal al concluir que la falsificación de los endosos no tenía efecto alguno en ley, particularmente en este caso donde cada endoso falsificado iba refrendado por la firma de Ortiz Ramón debidamente autorizado para ese tipo de gestión por la recurrida, se basó en un acuerdo al efecto entre la recurrida y los bancos expuesto en la conclusión de hechos número 6 anterior; que dicho acuerdo oral fue uno de mera identificación de manera que no tenía el efecto de convertir los cheques en libramientos al portador. La recurrente impugna la existencia de dicho acuerdo; sostiene que el endoso del propio Ortiz Ramón no constituía una garantía de la validez del endoso de la persona a favor de quien se expidió cada cheque y cuyo endoso falsificó Ortiz Ramón.

En tal virtud, arguye la recurrente que:

"El banco librado cargó indebidamente los cheques a la cuenta de la demandante. La demandante no ha acreditado, pues, que sufriera una *pérdida* que es el riesgo cubierto por la fianza. (Énfasis en el original.)

De resultar con derecho a recobrar bajo la fianza, la peticionaria tiene a su vez derecho a repetir contra el Banco Popular, que es el banco librado, cualquier suma que en definitiva venga obligada a pagar la peticionaria a la parte demandante en subrogación de los derechos de ésta. *Maryland Casualty Co.* vs. *Banco Popular,* supra; y contra el Banco de Ponce."

La primera cuestión a determinar es si el Banco de Ponce cambió dichos cheques en armonía con el entendido a que se

llegó entre el gerente de la sucursal de ese banco en Cayey, el Sr. Collazo, y el Sr. López Obén, jefe de la firma de la recurrida en Cayey. En segundo lugar, debemos determinar, en caso de que los cheques se hayan cambiado en violación de dicho entendido, si la recurrida fue negligente en informar prontamente la existencia del fraude al recibir los informes mensuales del estado de su cuenta en el Banco Popular. Por último, debemos resolver si la recurrente puede responsabilizar a los referidos bancos por la pérdida ocasionada por el fraude en cuestión.

La prueba sobre el entendido entre el Sr. Collazo y el Sr. López Obén surge del testimonio de aquél. A continuación copiamos del récord la parte pertinente del interrogatorio del Sr. Collazo.

"P. Tuvo usted, como gerente, ocasión de hablar con algún director de la Tobacco Marketing?

R. Sí, señor.

P. En relación con estos cheques de los refaccionados?

R. Como no, tuve unas cuantas conversaciones.

P. Explíquele a la Corte, en las ocasiones que tuvo hablar sobre eso?

R. Le voy a explicar; realmente cuando los cheques que llevaban los refaccionados a cambiar no eran personas conocidas para los 'tellers', entonces cuando la persona presentaba el cheque, en la ventanilla, el 'teller' no lo conocía y él le pedía al señor si podía haber una persona que le identificara para cambiarle el cheque; la persona pues empezaba a buscar por allí, no encontraban la persona conocida, como eran refaccionados de Cayey, de Cidra, como eso es en el campo, volvían a la oficina y alrededor de las doce regresaban aquí, ya molestos y no querían cambiar los cheques era lo que sucedía . . . .

TESTIGO:

R. Bueno, verdad, yo averigüé el 'teller' no quería cambiar el cheque a la persona porque no es conocida, un cheque de Cuarenta y Tres con Sesenta Tres o más, no lo cambió, no lo conocía naturalmente no lo cambió como le pedimos; *yo le digo muy natural, ustedes nos buscan una persona que identifique esas personas, entonces nosotros se lo cambiamos.*

P. Fue a la oficina Local de la Marketing, el Director hablar con él?

R. Alberto López Obén, Jefe de la Oficina allí y yo acordamos, que estaba allí en esa fecha y acordamos así, me *dieron a seleccionar el nombre de este muchacho Raúl Ortiz Ramón para que identificara las personas que fueran a cambiar los cheques.*

TESTIGO:

P. Cómo se instrumentó el acuerdo con los 'tellers'?

R. Se le dio instrucciones, se les informó del acuerdo que tuve en la cooperativa con todos los cheques de la Cooperativa de todos los refaccionados, si la persona no se conocía y que habían otros cheques se podían cambiar porque la persona se conocía, ahora había una serie de cheques no se conocían las personas, entonces *trayendo la firma de identificación de Raúl Ortiz Ramón se cambiaban.*

P. Cómo en la práctica, cómo funcionaba eso?

R. Ese acuerdo se llevaba a efecto.

LCDO. ARIAS CESTERO:

P. Cuál era el procedimiento?

TESTIGO:

R. El procedimiento?

P. Yo me refiero testigo comó se iba a identificar la persona?

R. Porque todos los cheques iban firmados por Raúl Ortiz Ramón.

P. Si Raúl firmaba los cheques de los refaccionados no tenían problemas?

R. No, señor.

P. Los refaccionados tenían que comparecer personalmente a la ventanilla a firmar en presencia del 'teller', así mismo Raúl Ortiz Ramón?

R. Bueno, eso los 'tellers' hubo ocasiones en que la persona venían, ellos se identificaban allí, además con la firma de Raúl Ortiz Ramón se le cambiaban en dinero.

P. Lo normal era en presencia del empleado?

R. Sí, señor, en presencia del 'teller' o venían firmados con la firma de Rául Ortiz Ramón.

P. Toda la verificación de Raúl era identificar la persona?

R. Lo hacían los 'tellers'.

HON. JUEZ:

*En ortas palabras, cuando traían la firma de Ortiz Ramón, no requerían ninguna identificación a la persona?*

TESTIGO:

R. Así es.

P. Cuando traían la firma de Ortiz Ramón el acuerdo era que no se requería ninguna identificación?

R. Ese era el acuerdo.

Nada más, Vuestro Honor." (Énfasis nuestro.)

De la referida prueba resulta que a los efectos de cambiar los cheques expedidos por la recurrida a favor de sus agricultores refaccionados, cuando éstos no eran conocidos del banco, éstos tenía que traer los cheques personalmente al banco acompañados por Ortiz Ramón; y entonces allí, en presencia del pagador del banco, debían endosar los tomadores los cheques y Ortiz Ramón identificar a dichos tomadores imponiendo su firma a continuación de la de los tomadores.

Las instrucciones dadas a los pagadores del Banco de Ponce en Cayey, de que (1) cuando "no se conocían las personas, entonces trayendo la firma de identificación de Raúl Ortiz Ramón se cambiaban"; y (2) "que se le podía cambiar porque ya ellos habían dado las instrucciones . . . siempre que Raúl Ortiz Ramón los firmara los cheques o vinieran firmados por él como beneficiario de los cheques", no se ajustaban al claro entendimiento de las partes el cual presumía que los tomadores de los cheques vendrían al banco acompañados de Ortiz Ramón y aquéllos endosarían los cheques y Ortiz Ramón identificaría a cada tomador imponiendo su firma a continuación de la del tomador, todo en presencia del pagador.

Debido a lo conocido que era Ortiz Ramón y la confianza que en él se había depositado por la sucursal del Banco de Ponce en Cayey, se desarrolló la costumbre de cambiar cheques de la recurrida suscritos a favor de agricultores refaccionados por aquélla, cuando Ortiz Ramón los presentaba endosados supuestamente por los tomadores pero sin estar acompañado por dichos tomadores. Entonces daba Ortiz Ramón como excusa por la ausencia de los tomadores, y se le aceptaba, que los tomadores habían ido al banco y estaban molestos porque

no quisieron cambiarle los cheques y se iban a la oficina de Ortiz Ramón; en otras ocasiones la excusa era que el tomador estaba enfermo. Tal confianza e informalidad en el procesamiento del cambio de los cheques llegó al extremo que los pagadores del Banco de Ponce, conocedores de la firma de Ortiz Ramón, no se percataron que los endosos de los tomadores en los cheques aparecían hechos con la misma tinta y con una letra muy parecida a la de Ortiz Ramón.

De lo expuesto concluimos que los funcionarios del Banco de Ponce en Cayey fueron negligentes en cambiarle tales cheques a Ortiz Ramón en abierta violación de los términos y la mejor práctica a seguir bajo el entendido a que sobre éste particular llegaron la recurrida y el Banco de Ponce.

No tenemos duda que esa práctica facilitó e hizo posible que Ortiz Ramón perpetrara el fraude en cuestión.

■ Por no ser atribuible a la recurrida el conocimiento de Ortiz Ramón de que los endosos de los tomadores en los cheques eran fraudulentos, no se constituyeron dichos cheques en documentos pagaderos al portador de acuerdo con el inciso 3 del Art. 362 del Código de Comercio en vigor (19 L.P.R.A. sec. 10(3)). Por el contrario, por vía de ilustración, el libramiento por $4,737.54 girado contra el Banco de Ponce por la recurrida, el cual aparecía firmado por Lebrón Obén y Ortiz Ramón, como oficiales de la recurrida autorizados a hacerlo por ella, era un documento pagadero al portador porque el conocimiento de Ortiz Ramón de que él había falsificado la firma de Lebrón Obén en este libramiento era atribuible a la recurrida. *E.M.L. Insurance Co.* v. *Banco Popular*, 91 D.P.R. 645 (1965).

■ Los cheques firmados por el Presidente y el Secretario Tesorero de la recurrida son libramientos a la orden. Requerían el endoso del tomador y su pago por el banco fue un pago indebido ya que los endosos habían sido falsificados. *Maryland Casualty Co.* v. *Banco Popular*, 92 D.P.R. 331, 341–343 (1965).

■ Las obligaciones de los bancos para con sus depositantes surgen de la relación contractual existente entre ellos. El banco le es responsable a su depositante cuando hace pagos en violación de las instrucciones de éste. Un banco no puede adquirir derecho alguno frente a un depositante cuando ha pagado un cheque en que la firma de éste ha sido falsificada, a menos que el depositante esté impedido de alegar en su defensa la falsedad o falta de autorización. *Portilla* v. *Banco Popular*, 75 D.P.R. 100, 115, 118 (1953); *Maryland Casualty Co.* v. *Banco Popular*, supra, pág. 342; *Glen L. Martin Co.* v. *Fidelity Baltimore N.B.V.T. Co.*, 145 A.2d 267 (Md. 1958); *Defiance Lumber Co.* v. *Bank of California*, 41 P.2d 135 (Cal. 1935).

■ La subrogación transfiere al fiador que paga por otro los derechos y defensas de éste en cuanto al crédito satisfecho y queda sujeto a las defensas que tuviere el que originalmente pagó el crédito mediante la presentación de documentación fraudulenta. Código Civil, Art. 1166 (31 L.P.R.A. sec. 3250); Castán, *Derecho Civil Español*, Vol. III, pág. 284; *United States* v. *Munsey Trust Co.*, 332 U.S. 234, 242 (1947); *Hartford Acc. I. Co.*, v. *First Nat. B. & T. Co. of Tulsa, Okl.*, 287 F.2d 69 (10th Cir. 1961); *Bank of Fort Mill* v. *Lawyers Title Insurance Corp.*, 268 F.2d 313, 317 (4th Cir. 1959).

■ El récord demuestra que Ortiz Ramón no tan sólo falsificó el endoso de tomadores en los cheques sino que simuló las solicitudes y las "listillas" de los préstamos de manera que la recurrida no podía percatarse de, y poner coto al, fraude en cuestión al comprobar sus cheques cancelados y devueltos por el Banco Popular. No hubo prueba de que pudiera haber descubierto dicho fraude aun al finalizar cada cosecha cuando se liquidaban los préstamos correspondientes a dicha cosecha. Por lo tanto, no procede la defensa aducida por el Banco de Ponce de que la recurrida fue negligente en no descubrir y notificar las falsificaciones con prontitud, basada en la norma

que adoptamos en *Portilla* v. *Banco Popular*, supra, págs. 118–119.

En vista de lo expuesto, *debe modificarse la sentencia, declarando con lugar la demanda contra tercero y la demanda contra coparte, responsabilizando a los terceros demandados a rembolsar a la recurrente las cuantías de la sentencia dictada en su contra en este caso y que haya pagado a la recurrida, más sus costas y $1,000 de honorarios de abogado y al Banco de Ponce a rembolsar al Banco Popular toda o cualquier parte de las anteriores sumas que pague, y además, debe condenarse al Banco de Ponce a pagar al Banco Popular las costas y $1,000 de honorarios de abogado. Así modificada se confirmará la sentencia recurrida.*

El Juez Presidente, Señor Negrón Fernández, al igual que el Juez Asociado Señor Martínez Muñoz, no intervino.