St. Paul Fire & Marine Insurance Company y Lewis Business Forms of Puerto Rico, Inc., apelantes, *v.* Caguas Federal Savings & Loan Association of Puerto Rico, apelada.

*Número:* CE-86-493 *Resuelto:* 30 de junio de 1988

762

*Francisco Castro Amy,* de *Castro & Castro,* abogado de los ape-
lantes; *Carlos Martínez Vélez,* de *Montañez & Alicea,* abogado
de la apelada.

EL JUEZ PRESIDENTE SEÑOR PONS NÚÑEZ emitió la opinión del
Tribunal.

A tenor con la Regla 53.1(c) de Procedimiento Civil, 32
L.P.R.A. Ap. III, y la Regla 27 de nuestro Reglamento, 4
L.P.R.A. Ap. I-A, la Corte de Apelaciones de Estados
Unidos para el Primer Circuito nos ha certificado las si-
guientes dos (2) preguntas referentes a la Ley Uniforme de
Instrumentos Negociables, 19 L.P.R.A. secs. 1–386, y su re-
lación con el derecho general de daños y perjuicios:

(1) ¿Responde al tomador de un cheque un banco que, sin
incurrir en negligencia, paga dicho cheque en virtud de un
endoso no autorizado?

(2) Si la contestación a la pregunta anterior es en la afir-
mativa, ¿es la negligencia previa del tomador una defensa a
dicha responsabilidad del banco?

Antes de contestar a las preguntas certificadas es necesa-
rio exponer brevemente los hechos que dan lugar al presente
caso.

I

Lewis Business Forms, Inc. (Lewis) es una corporación
de Florida que ha mantenido una sucursal en Puerto Rico
desde 1961. Luis A. Ayala fue el contador de la sucursal de
Puerto Rico de Lewis desde 1967 hasta 1982. Entre sus fun-
ciones como contador estaba el preparar las facturas y reci-
bir su pago. Sin embargo, Ayala no tenía autorización de
Lewis para cambiar o endosar cheques. El tribunal de ins-

tancia determinó que Lewis fue negligente al no separar estas dos (2) funciones. Su consolidación en una sola persona permitió a Ayala crear un elaborado esquema de malversación de fondos que operó sin ser detectado por casi diez (10) años.

El plan de malversación de fondos comenzó cuando Ayala abrió una cuenta en el Caguas Federal Savings & Loan Association (Caguas) bajo el nombre de "Luis Ayala haciendo negocios como Lewis Business Forms". La única firma autorizada en la cuenta era de Ayala. Caguas no tenía relaciones comerciales previas ni con Ayala ni con Lewis. Luego, Ayala se apropió de cheques remitidos por clientes de Lewis en pago de mercancía, los endosó sin autorización de Lewis y los depositó en la cuenta del Caguas. De ésta, Ayala hizo retiros para su uso personal.

Ayala eludió la rápida detección del desfalco valiéndose de varios métodos fraudulentos de contabilidad. Cuando finalmente fue descubierto, Ayala se había apropiado de $286,595.87 pertenecientes a Lewis.

St. Paul Fire & Marine Insurance Company, la aseguradora de Lewis, cubrió alrededor de dos terceras partes de la pérdida. Ambas corporaciones entonces incoaron acción en contra de Caguas al alegar *inter alia* que un banco que paga a un falsificador o endosante no autorizado responde al tomador, bajo la Ley Uniforme de Instrumentos Negociables, 19 L.P.R.A. sec. 24.

Apoyándose en que el banco no había incurrido en negligencia, y que Lewis había sido negligente al no tener una separación adecuada de funciones en el departamento de contabilidad de la sucursal de Puerto Rico, el tribunal de instancia desestimó la demanda. En apelación, Lewis reitera su posición de que Caguas debe responderle bajo la Ley Uniforme de Instrumentos Negociables, *supra*. Por su parte, Caguas argumenta que al no existir relación contractual en-

tre éste y Lewis, a tenor con el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, sólo sería responsable si el daño hubiese sido producto de la negligencia de Caguas.

## II

■ La Ley Uniforme de Instrumentos Negociables, *supra*, dispone:

> Cuando se falsificare una firma o se hiciere sin autorización de la persona de quien se supone que procede la firma, no tendrá efecto alguno, ni se adquirirá, en virtud de ella, derecho alguno para retener el documento o para cancelarlo o para obligar al pago del mismo a cualquiera de las partes que en él figuren, a menos que la parte contra quien se tratare de hacer valer tal derecho estuviere impedido para alegar en su defensa la falsedad o falta de autorización. 19 L.P.R.A. sec. 24.

■ Consistentemente hemos interpretado esta sección en el sentido de que el banco que paga un cheque bajo un endoso o firma falsificada o no autorizada le responde directamente al librador o a su cesionario. No obstante, el librador o su cesionario están impedidos de reclamar contra el banco cuando, en ausencia de negligencia del banco, la causa próxima de la falsificación del cheque es la negligencia del librador. *Solé Electric, Inc. v. Bank of Nova Scotia*, 103 D.P.R. 423 (1975); *P.R. Tobacco Mkt. Ass'n. v. P.R. & Amer. Ins.*, 100 D.P.R. 387 (1972); *Maryland Casualty Co. v. Banco Popular*, 92 D.P.R. 331 (1965); *Portilla v. Banco Popular*, 75 D.P.R. 100 (1953).

Nótese que en todos los casos anteriores es el librador quien reclama contra el banco librado. "[L]a acción en estos casos no procede de letras de cambio, ni de cheques, ni de otros documentos de cambio, sino que es una en cobro de dinero, basada en un contrato de préstamo (la cuenta corriente) y en una relación de acreedor y deudor." *Maryland Casualty Co. v. Banco Popular*, supra, pág. 335.

■ Distinto a los casos que hemos resuelto, en el caso de autos no existe relación contractual entre las partes, puesto que es el tomador quien reclama al banco. Consideramos, sin embargo, que ello no impide que también la presente controversia sea gobernada por la citada Ley Uniforme de Instrumentos Negociables, *supra*. La aludida Sec. 24 no distingue para fines de su aplicabilidad entre reclamaciones presentadas por libradores y las interpuestas por tomadores. Se limita a establecer que a falta de autorización de una firma no se producen efectos en el documento, a menos que la parte, librador o tomador, esté impedida de alegar su falsedad o falta de autorización.

■ Debe tenerse presente que, en lo concerniente al asunto bajo consideración, ésta es una disposición de naturaleza especial, por lo que "debe prevalecer sobre cualquier otro precepto aplicable que sea de carácter general". *París v. Canety*, 73 D.P.R. 403, 406 (1952). En vista de ello, no puede regirse este caso por las disposiciones del Código Civil, específicamente por el Art. 1802, *supra*, a pesar de la relación extracontractual prevaleciente entre las partes. En casos como el que nos ocupa, sólo podemos acudir al Código Civil cuando algún aspecto de la controversia no pueda ser debidamente atendido, primero por la Ley Uniforme de Instrumentos Negociables y luego, subsidiariamente, por el Código de Comercio, después de los cuales se recurre al Código Civil como derecho supletorio. Véanse: 19 L.P.R.A. sec. 386, y 10 L.P.R.A. sec. 1002. Es de rigor reconocer que de la Ley Uniforme de Instrumentos Negociables, *supra*, emana, como más adelante ampliaremos, una causa de acción directa e independiente del librador o tomador contra el banco, aun cuando éste no haya incurrido en negligencia. Consideraremos que esta disposición atiende adecuadamente la cuestión aquí planteada, por lo que no procede orientar la solución de este caso por los postulados del Art. 1802 del

Código Civil, *supra*, para el cual la negligencia es un elemento insoslayable. La Ley Uniforme de Instrumentos Negociables, *supra*, descansa en una tradición jurídica y, por ende, en fundamentos doctrinarios distintos a los del Art. 1802 del Código Civil, *supra*, que no disponen nada sobre la negligencia como un elemento indispensable de esa causa de acción. En buena teoría de adjudicación y hermenéutica legal es esa disposición y su historial los que deben guiar el análisis del asunto que nos ocupa a los fines de responder a las preguntas certificadas por la ilustrada Corte de Apelaciones de Estados Unidos para el Primer Circuito.

## III

Nuestra Ley Uniforme de Instrumentos Negociables procede directamente de la Ley Uniforme de Instrumentos Negociables de 1896, la primera ley uniforme en aceptarse ampliamente en los estados de la Unión. Véase F.K. Beutel, *Beutel's Brannan Negotiable Instruments Law*, 7ma ed., Cincinnati, Ed. W.H. Anderson, 1948, págs. 73–79. Aunque muchas de sus secciones fueron tomadas del *Bill of Exchange Act* inglés de 1882, la codificación que imperaba en California tuvo en ella una gran influencia. Beutel, *op. cit.* De todos modos, el propósito principal de la ley fue codificar el derecho angloamericano vigente en un solo cuerpo uniforme.

A tenor con el derecho vigente en Estados Unidos a la fecha de redacción de la Ley Uniforme de Instrumentos Negociables, el tomador de un instrumento disponía de una acción directa sin culpa contra el que pagaba a un tercero bajo una firma falsificada o no autorizada. Véanse: *Talbot v. Bank of Rochester*, 1 Hill 295, 15 N.Y. Common L. Repts. 134 (1841); F. Kessler, *Forged Indorsements*, 47 (Núm. 6) Yale L.J. 863 (1938). Dicha regla, de origen inglés, asigna al que paga un cheque el riesgo de que ese último endoso sea falsifi-

cado o no autorizado. *Mead v. Young*, 4 T.R. 28 (1790), citado en Kessler, *supra*, págs. 866–867.

■ La regla de "que aun un comprador *bona fide* no puede adquirir título a través de un endoso falsificado y que un pago *bona fide* de un instrumento así falsificado no impide una acción posterior por el verdadero dueño en contra del aceptante o partes anteriores, ha sido seguida tanto por las cortes de Inglaterra como las de [Estados Unidos] y ha sido incorporada a la Ley Uniforme de Instrumentos Negociables". (Traducción nuestra.) Kessler, *supra*, págs. 867–868.

■ En el balance de intereses el legislador, al adoptar la regla jurisprudencial, ha querido que el riesgo sea asumido por el que paga a través de un endoso falsificado o no autorizado. La interpretación posterior de la Sec. 23 de la Ley Uniforme de Instrumentos Negociables de 1896, idéntica a nuestra Sec. 24, *supra*, ha sido compatible con dicha intención original. Véanse los casos citados en: Anotación, 100 A.L.R.2d 670 (1965); Beutel, *op. cit.*, págs. 451–455. Para casos resueltos luego de la promulgación del Código Uniforme de Comercio, véanse: Anotación, 23 A.L.R.4th 855 (1983); H.J. Bailey, *Brady on Bank Checks*, 5ta ed., Boston, Ed. Warren, Gorham & Lamont, 1979, Cap. 24.

■ Adoptamos esta norma en nuestra jurisdicción, no sólo por lo persuasivo que resultan los casos interpretativos de la Sec. 23, *supra*, sino además porque el lenguaje de la Ley Uniforme de Instrumentos Negociables, *supra*, es cónsono con la intención legislativa de que sea el que paga a través de un endoso no autorizado el que asuma el riesgo. No vemos justificación alguna para desviarnos de la regla general de hermenéutica que presume que el legislador de Puerto Rico, al adoptar un estatuto de otra jurisdicción, también adopta la interpretación del mismo hecha por el tribunal de

más alta jerarquía de ese lugar a la fecha de su adopción.(¹) *Pueblo v. Reyes Bonilla*, 100 D.P.R. 265, 269 (1971); *El Pueblo v. Rivera (a) Panchito*, 7 D.P.R. 332, 353 (1904).

## IV

■ Resta por considerar el efecto que la negligencia del demandante puede tener sobre su causa de acción. Si bien es cierto que el que paga un cheque cuyo endoso es falsificado o no autorizado debe asumir el riesgo, según el propio lenguaje de la mencionada Ley Uniforme de Instrumentos Negociables, *supra*, el legítimo dueño del cheque podría estar impedido de presentar una reclamación. Anteriormente habíamos expresado que "[e]l banco que paga un cheque con endoso falsificado puede, en casos limitados, librarse de responsabilidad al girador demostrando que éste ha incurrido en negligencia que facilite el pago sin que el banco incurriere en negligencia". *Solé Electric, Inc. v. Bank of Nova Scotia*, supra, pág. 426. Sostenemos que igual norma debe regir lo relativo a la responsabilidad del banco para con el tenedor del instrumento. Véase Anotación, 87 A.L.R.2d 638 (1963).

■ En síntesis, la regla general sobre distribución de riesgos aplica sólo en aquellos casos en que ambas partes han sido diligentes. Cuando tanto el demandante como el

---

(¹) Compárese la situación bajo la Convención de Ginebra de 1931 adoptada en la mayoría de las jurisdicciones continentales europeas. Bajo ésta, el tenedor de buena fe que sin negligencia adquiere un instrumento bajo un endoso falsificado queda totalmente protegido. El riesgo en estos casos recae sobre el librador, aunque éste no haya incurrido en negligencia. E.A. Farnsworth, *Cases and Materials on Commercial Paper*, 3ra ed., Nueva York, The Foundation Press, 1984, págs. 272–274.

Por otro lado, es interesante señalar que la legislación española sobre el cheque se ha apartado de la solución de la Convención de Ginebra. En ausencia de negligencia, "el daño que resulte del pago de un cheque falso o falsificado será imputado al [banco] librado...". Art. 156 de la Ley Cambiaria y del Cheque de 16 de julio de 1985, II (Anot. 1776) *Aranzadi, Repertorio Cronológico de Legislación* 3343 (1985).

banco demandado hayan incurrido en negligencia, el tribunal puede moderar la responsabilidad del banco. Ahora bien, en casos donde el único negligente haya sido el librador o el tomador, puede ser totalmente eximida de responsabilidad la institución bancaria.

A la luz de lo anteriormente señalado, *las respuestas a las preguntas certificadas son en ambos casos afirmativas. Se dictará certificación al efecto.*

El Juez Asociado Señor Rebollo López disiente, por cuanto entiende que según los hechos en que se apuntala la certificación una institución bancaria (en el presente caso, el Caguas Federal Savings & Loan Association of Puerto Rico) no tiene responsabilidad alguna. El Juez Asociado Señor Negrón García se inhibió.