AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO, demandante y recurrida, y CITIBANK, N.A., codemandada y recurrida, *v.* LAS AMÉRICAS TRUST COMPANY, codemandada y recurrente, y BANCO DE SAN JUAN, tercero demandado y recurrido.

*Número:* RE-86-197          *Resuelto:* 16 de junio de 1989

*Jorge Cela Ureña*, abogado de la recurrente; *Pedro Santiago Torres*, abogado de la Autoridad de Energía Eléctrica, recurrida; *José Antonio Tulla*, de *McConell, Valdés, Kelly, Sifre, Griggs & Ruiz-Suria*, abogado del Citibank, N.A., recurrida; *Jorge Souss Villalobos*, de *Brown, Newsom & Córdova*, abogado del Banco de San Juan, recurrido.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

El uso del cheque como instrumento del tráfico bancario dio origen al presente recurso, en el cual nos corresponde resolver si el banco que endosa un cheque con las siglas "P.E.G." (*prior endorsements guaranteed*) garantiza que el cheque es genuino y no ha sufrido una alteración esencial. Veamos los hechos.

I

La Autoridad de Energía Eléctrica (en adelante A.E.E.) libró contra su cuenta Núm. 0410799 en el Citibank, N.A. (en adelante Citibank) el cheque Núm. 03410 por la cantidad de $20,486.25 a favor de John Grazel, Inc. El cheque fue alterado. Se eliminó el nombre de John Grazel, Inc. y se sustituyó por el nombre de Héctor Rivera Rivera como beneficiario. El supuesto beneficiario endosó el cheque y lo depositó en una cuenta corriente a nombre de Héctor Rivera Rivera en Las Américas Trust Co. (en adelante L.A.T.Co.).

En esa época, L.A.T.Co. no era miembro de la Puerto Rico Clearing House Association, Inc., por lo que mantenía un acuerdo privado con el Royal Bank de Puerto Rico, antes Banco de San Juan, para que este último presentara al cobro ante la Cámara de Compensación los cheques depositados en L.A.T.Co. que estuvieran girados contra otros bancos.

En el caso de autos, al tratarse de un cheque girado contra el Citibank, L.A.T.Co. procedió a poner en marcha el proceso para presentarlo al cobro. Lo endosó con su nombre y añadió las siglas "P.E.G." que, en el argot bancario, significan *prior endorsements guaranteed.* Posteriormente, se lo entregó al Royal Bank quien también lo endosó con su nombre y las siglas "P.E.G.". Royal Bank presentó al cobro el referido cheque, y finalmente el Citibank, a través de la Cámara de Compensación, hizo la correspondiente transferencia de fondos a Royal Bank por el importe del cheque.

La A.E.E. demandó a L.A.T.Co. y a Citibank alegando que ambas instituciones incurrieron en incumplimiento de sus obligaciones y responsabilidades bancarias al hacer efectivo el referido cheque que fue alterado de su faz. L.A.T.Co. y Citibank se presentaron recíprocamente demandas contra coparte y reconvención. Citibank presentó demanda contra tercero en contra de Royal Bank. Royal Bank presentó demanda contra coparte contra L.A.T.Co.

El tribunal de instancia declaró con lugar la demanda y ordenó al Citibank que satisficiera a la A.E.E. el importe del cheque, más intereses, costas y honorarios de abogado. A su vez, declaró con lugar la demanda contra tercero presentada por el Citibank y ordenó a Royal Bank a pagar a Citibank cualquier cantidad que este último deba pagarle a la A.E.E. Finalmente, declaró con lugar la demanda contra coparte presentada por el Royal Bank y ordenó a L.A.T.Co. a pagar a Royal Bank cualquier cantidad que este último deba pagar a Citibank. Concluyó el tribunal que tanto Royal Bank como L.A.T.Co. son responsables por el pago del cheque alterado ya que, al endosar el cheque con las siglas "P.E.G.", garantizaron que tenían título válido sobre el instrumento.

De dicha sentencia acude ante nos L.A.T.Co., mediante recurso de revisión, haciendo los señalamientos de error siguientes:

1. PRIMER ERROR: Respetuosamente entendemos que erró el Honorable Tribunal al concluir que la A.E.E. no obró negligentemente, al no mantener controles adecuados y al ordenar la suspensión de pago de un cheque de $20,486.25, catorce (14) días después de recibir notificación escrita de que el referido cheque estaba extraviado y más de catorce (14) días después de recibir varias notificaciones por teléfono a esos efectos.

2. SEGUNDO ERROR: Respetuosamente entendemos que erró el Honorable Tribunal al concluir que el sello que estampan los bancos cuando presentan al cobro un cheque a través de la Cámara de Compensación tiene el efecto de un endoso según este término se contempla en la Ley de Instrumentos negociables y por consiguiente, tal sello tiene el efecto de garantizar que dicho cheque no ha sido alterado.

3. TERCER ERROR: Respetuosamen[t]e entendemos que erró el Honorable Tribunal al concluir que LATCO fue negligente en el manejo del referido cheque.

4. CUARTO ERROR: Respetuosamente entendemos que erró el Honorable Tribunal al concluir que LATCO adeuda la

suma de $20,486.25 más los intereses al 12% anual desde la fecha de radicación de la demanda y la suma de $2,500.00 por concepto de honorarios de abogados. Solicitud de revisión, pág. 6.

## II

Alega la recurrente en su segundo señalamiento de error que erró el tribunal de instancia al concluir que las siglas "P.E.G." que estampan los bancos cuando presentan al cobro un cheque es un endoso de los previstos por la Ley Uniforme de Instrumentos Negociables y, por lo tanto, garantiza que dicho cheque o instrumento no ha sido alterado.

La solución correcta de la controversia planteada nos mueve a evaluar las relaciones jurídicas y responsabilidades de las partes involucradas en el libramiento del cheque y en el proceso interbancario de transferencia y cobro del mismo.

El cheque constituye un instrumento negociable mediante el cual el librador da una orden incondicional al banco librado para que este último pague a su presentación cierta suma de dinero a la orden o al portador. Art. 538 del Código de Comercio de 1932 (19 L.P.R.A. sec. 362). En la práctica, el vínculo entre el librador y su banco no surge en el momento en que se libra el cheque. Por lo general, éstos han quedado previamente vinculados mediante el establecimiento de una cuenta corriente contra cuyos fondos se hacen efectivas las órdenes de pago del librador.

En ocasiones anteriores hemos tenido que evaluar el contrato de cuenta corriente para determinar la responsabilidad del banco librado cuando ha pagado cheques con endosos falsificados o con la firma falsificada del librador. Resolvimos que, a tenor con el Art. 376 del Código de Comercio

de 1932 (19 L.P.R.A. sec. 24),(1) las firmas falsificadas en un cheque no transmiten derecho; por lo tanto, el banco que paga cheques con firmas o endosos falsificados le es responsable al librador por la cantidad así pagada, a menos que la negligencia del último haya facilitado la falsificación, en cuyo caso el banco queda exonerado de responsabilidad. *St. Paul Fire & Marine v. Caguas Fed. Savs.*, 121 D.P.R. 761 (1988); *Solé Electric, Inc. v. Bank of Nova Scotia*, 103 D.P.R. 423 (1975); *P.R. Tobacco Mkt. Ass'n. v. P.R. & Amer. Ins.*, 100 D.P.R. 387 (1972); *Portilla v. Banco Popular*, 75 D.P.R. 100, 113 (1953).

La situación que nos ocupa es distinta. No se trata de un cheque con firmas falsificadas, sino de un cheque que ha sido alterado. El efecto que la alteración tiene en el documento sobre los derechos y las obligaciones de las partes, y no la manera en que se hace, es lo determinante para calificar una alteración como esencial. B. Santiago Romero, *Tratado de Instrumentos Negociables*, 2da ed., San Juan, Ed. Universitaria, 1981, pág. 285. La sustitución del nombre del beneficiario original, John Grazel, Inc., por el de Héctor Rivera Rivera sin lugar a dudas varió el efecto del instrumento y la relación de las partes involucradas en el mismo. Se trata propiamente de una alteración esencial de las comprendidas en el Art. 478 del Código de Comercio de 1932 (19 L.P.R.A.

---

(1) *"Sec. 24. Firma falsificada en documento*

"Cuando se falsificare una firma o se hiciere sin autorización de la persona de quien se supone que procede la firma, no tendrá efecto alguno, ni se adquirirá, en virtud de ella, derecho alguno para retener el documento o para cancelarlo o para obligar al pago del mismo a cualquiera de las partes que en él figuren, a menos que la parte contra quien se tratare de hacer valer tal derecho estuviere impedido para alegar en su defensa la falsedad o falta de autorización.—Código de Comercio, 1932, art. 376."

sec. 207).(2) El pago hecho por el Citibank del documento así alterado debemos evaluarlo en el contexto de la cuenta corriente que A.E.E. mantenía con el referido banco.

La cuenta corriente se caracteriza como un contrato de préstamo mediante el cual el banco queda obligado a pagar o restituir lo que se le ha entregado en calidad de préstamo, según la orden de su cliente. *P.R. Tobacco Mkt. Ass'n. v. P.R. & Amer. Ins.*, supra, pág. 397; *Portilla v. Banco Popular*, supra. En *P.R. Tobacco Mkt. Ass'n. v. P.R. & Amer. Ins.*, supra, pág. 397, enfatizamos que:

> Las obligaciones de los bancos para con sus depositantes surgen de la relación contractual existente entre ellos. El banco le es responsable a su depositante cuando hace pagos en violación de las instrucciones de éste.

Sobre este mismo principio descansa la doctrina sentada en Estados Unidos tanto bajo la Ley de Instrumentos Negociables de 1896, de donde procede la nuestra, como bajo el vigente Código Uniforme de Comercio, que considera que el pago de un cheque alterado o de un cheque con la firma del librador falsificada constituye un pago hecho en violación a las instrucciones del librador, por lo que responsabiliza al banco por la cantidad así desembolsada. J.J. White y R.S. Summers, *Uniform Commercial Code*, 2da ed., Ed. West Publishing Co., 1980, págs. 585 y 658–659; *Chilson v. Capital*

---

(2) *"Sec. 207. Alteración esencial*
"Toda alteración que cambie—
(1) La fecha;
(2) la cantidad pagadera, como capital o intereses;
(3) la fecha o el lugar del pago;
(4) el número o la relación entre las partes;
(5) la especie o moneda en que ha de hacerse el pago;
o que agregue la designación de un lugar para el pago cuando no se ha expresado ninguno, o cualquier otro cambio o adición que altere los efectos del documento en cualquier sentido, constituirá una alteración esencial.—Código de Comercio, 1932, art. 478."

*Bank of Miami, Fla.*, 701 P.2d 903 (Kan. 1985). En ese sentido, Michie nos señala:

> The bank's contractual duty to charge a depositor's account only on his authentic order is absolute. If the depositor is free from blame and has done nothing to mislead the bank, all the loss must be borne by the bank paying a forged check, for in such case it acts at its peril, and it will be held to have paid out its own funds and not those of the depositor. The bank cannot avoid liability by showing that it acted in good faith, believing that the person presenting the check was authorized to sign it and draw out the money.
>
> .   .   .   .   .   .   .   .
>
> If a bank pays out money to the holder of a check upon which the name of the depositor, or of a payee or indorsee, is forged, it is simply no payment as between the bank and the depositor; and the legal state of the account between them, and legal liability of the bank to him, remain just as if the pretended payment had not been made.
>
> .   .   .   .   .   .   .   .
>
> The reason for the rule that, when a bank pays a forged or raised check, it is held to have paid it out of its own funds and cannot charge the payment to the depositor's account, is that there is an implied agreement by the bank with its depositor that it will not disburse the money standing to his credit except in accordance with his directions. In their relations with depositors, banks are held to a rigid responsibility. They undertake the care and custody of the customer's money for the benefit derived from its use while in their hands, and they are bound to pay from time to time such sums as are ordered. (Escolios omitidos.) 5B *Michie on Banks and Banking* Sec. 274 (1983).

Sin embargo, la responsabilidad del banco no es absoluta. Al igual que en los casos de cheques con firmas falsificadas, se reconoce que el banco librado queda exonerado de responsabilidad si la actuación negligente del librador ha facilitado el pago indebido del cheque. White y Summers, *op. cit.*, pág. 659; H.J. Bailey III, *What you should Know about Al-*

*tered or Forged Checks (Part 2)*, 34 (Núm. 5) Prac. Law. 35 (1988). En *Michie,* supra, pág. 81, se explica:

> If, however, a banker pays money belonging to the customer upon an order which is not genuine, he must suffer, and to justify the payment he must show that the order is genuine, not in signature only, but in every other respect, or he must show negligence on the part of the depositor.

En el caso de autos, el pago del cheque se hizo en contravención a la orden de pago que la A.E.E. dio al Citibank mediante el cheque Núm. 03410. La instrucción específica de la A.E.E. era que el cheque se pagara a la orden de John Grazel, Inc. y no a la orden de Héctor Rivera Rivera. Al así hacerlo, el Citibank quebrantó la obligación contractual que contrajo con la A.E.E. Ésta no incurrió en negligencia que exonere al banco de responsabilidad. Veamos.

El 15 de marzo de 1983, mediante un sistema mecanizado de computadora, la A.E.E. preparó el cheque Núm. 03410 a favor de John Grazel, Inc. Varios días después, la señora Ortega, supervisora de servicios bancarios de la A.E.E., recibió una llamada del Vicepresidente de John Grazel, Inc. inquiriéndole el pago de $20,486.25. La señora Ortega le informó que se había emitido un cheque a su favor por esa cantidad y se había enviado por correo, por lo que debía esperar unos días más para dar tiempo a que el cheque llegara y, además, que también convenía esperar un tiempo antes de solicitar la paralización del pago para evitar las dilaciones que conllevaba el emitir otro cheque en la A.E.E.

Posteriormente, el 29 de marzo de 1983, la A.E.E. recibió notificación escrita de John Grazel, Inc. en la que se le informó que el referido cheque no se había recibido y se solicitó la expedición de uno sustituto. La A.E.E. hizo una búsqueda interna del cheque, la cual reflejó que todavía el mismo no se había pagado. El 13 de abril de 1983 la A.E.E., mediante entrega personal en el Citibank, solicitó que se paralizara el pago del cheque. Citibank contestó que no proce-

día, ya que el cheque se había pagado el 28 de marzo. Así, el 18 de abril de 1983 la A.E.E. hizo un cheque sustituto a favor de John Grazel, Inc.

La recurrente alega que la A.E.E. fue negligente al ordenar la paralización catorce (14) días después de la notificación escrita de John Grazel, Inc. No tiene razón. Las circunstancias particulares en el caso de autos nos mueven a confirmar la decisión del tribunal de instancia de que la A.E.E. no fue negligente.

Al recibir la llamada telefónica de John Grazel, Inc., la A.E.E. verificó que el cheque se había emitido y se había enviado por correo. Luego, al recibirse la notificación escrita, realizó una búsqueda interna y, al percatarse de que el cheque no se había cobrado, solicitó la paralización del pago. No surge de los autos que el solicitar la paralización del pago catorce (14) días después de recibida la notificación escrita se debió a negligencia de la A.E.E.

El tribunal de instancia concluyó que durante el mes de marzo la A.E.E. emitió cerca de tres mil (3,000) cheques, y el hecho de que este cheque fuera interceptado por una persona desconocida no constituía un suceso común en las operaciones bancarias de la A.E.E. Citamos de las determinaciones de hecho del tribunal de instancia:

> 20) La AEE genera miles de cheques. En un mes dado (marzo 1983) esa cantidad ascendió a cerca de 3,000 cheques por una suma superior a 100 millones de dólares. En un tipo de operación de esta naturaleza es imposible el control absoluto de cada cheque. Los controles internos de cheques de la Autoridad son aceptables dentro de las normas de contabilidad aceptables en la industria. La AEE no incurrió en negligencia crasa que facilitara la alteración y el depósito del cheque.
>
> 21) A la AEE anualmente se le auditan sus operaciones por una firma independiente, que para la fecha de este cheque era la firma de Arthur Andersen, y que en ningún momento antes o después del 15 de marzo de 1983 se le ha encontrado fallas o

deficiencia alguna a la forma y manera que se controla el manejo de fondos y cheques de la Autoridad.

22) De una investigación que practicara la oficina de Auditoría Interna de la Autoridad de Energía Eléctrica se estudió la forma en que se maneja el correo interno de la Autoridad y que no se pudo determinar que fuera interceptado dicho cheque en el correo interno. La Autoridad tiene un control adecuado de manejo de cheques. Anejo I, págs. 8–9.

■ No hay indicios de pasión, de prejuicio o de parcialidad en la apreciación de la prueba que nos muevan a intervenir con las determinaciones de hecho del tribunal de instancia. *La Costa Sampedro v. La Costa Bolívar*, 112 D.P.R. 9, 19 (1982); *Morán Simó v. Gracia Cristóbal*, 106 D.P.R. 155, 161, (1977); *Epstein v. F. & F. Mortgage Corp.*, 106 D.P.R. 211, 217 (1977); *Ortiz v. Cruz Pabón*, 103 D.P.R. 939, 946 (1975). Al haberse determinado que la A.E.E. no actuó negligentemente, el Citibank le es responsable a la A.E.E. por el pago indebido del cheque.

### III

El pago hecho por el Citibank fue el resultado del proceso interbancario de transferencia que se puso en marcha para el cobro del instrumento. El cheque fue depositado en L.A.T.Co. Ésta, a tenor con las exigencias de la Cámara de Compensación local, endosó el cheque con su nombre y con las siglas "P.E.G." (*prior endorsements guaranteed*); luego lo transfirió a Royal Bank quien, antes de presentarlo al cobro en la Cámara de Compensación, también lo endosó con su nombre y con las siglas "P.E.G.".

El foro de instancia resolvió que Royal Bank le responde al Citibank y que L.A.T.Co. le responde a Royal Bank como endosantes del cheque. Ante nos, L.A.T.Co. alega que imprimir las siglas "P.E.G." en el cheque no constituye un endoso de los previstos por la Ley Uniforme de Instrumentos Negociables que le responsabilice por la cantidad pagada por el cheque alterado.

■ La naturaleza del endoso "P.E.G." no está definida por nuestra Ley Uniforme de Instrumentos Negociables, ya que la misma no regula las relaciones interbancarias. Tampoco está definida por la Ley de Bancos, que se limita a reglamentar el aspecto administrativo de los bancos. Se trata de una situación novel, carente de precedente alguno en nuestra jurisdicción.

■ El endoso "P.E.G." constituye una práctica bancaria que adoptaron las distintas Cámaras de Compensaciones en las jurisdicciones estatales ante la confusión creada por el silencio de la Ley de Instrumentos Negociables de 1896 en lo referente a las responsabilidades de los bancos que intervenían en la transferencia y en el cobro de los cheques.

Originalmente, los bancos que participaban en este proceso sólo endosaban los cheques con el nombre de la institución bancaria. Cuando surgían reclamos entre el banco librado y el banco endosante por el pago de cheques fraudulentos, los tribunales consideraban que ese endoso no hacía responsable al banco endosante de todas las garantías que ofrece un endosante bajo la Ley de Instrumentos Negociables de 1896,(3) ya que éstas sólo corren a favor del tenedor de buena fe que adquiere el documento mediante negocia-

---

(3) *"Warranty Where Negotiation by Delivery, Etc.*

"Every person negotiating an instrument by delivery or by a qualified indorsement, warrants,—

"(1) That the instrument is genuine and in all respects what it purports to be;

"(2) That he has a good title to it;

"(3) That all prior parties had capacity to contract;

"(4) That he has no knowledge of any fact which would impair the validity of the instrument or render it valueless.

But when the negotiation is by delivery only, the warranty extends in favor of no holder other than the immediate transferee.

The provisions of subdivision three of this section do not apply to persons negotiating public or corporation securities, other than bills and notes." (Escolio omitido.) F.K. Beutel, *The Negotiable Instruments Law,* 7ma ed., Cincinnati, Ed. W.H. Anderson, 1948, Sec. 65, pág. 946.

ción. Se consideraba que en esta etapa el documento no se estaba negociando, sino que estaba en el proceso de ser cobrado. Sin embargo, le permitían recobrar al banco librado bajo distintas teorías. Algunos tribunales permitían recobrar bajo la teoría de que el endoso constituía una garantía implícita de que el instrumento era genuino; otras permitían recobrar bajo la teoría de que el banco librado había pagado por error de hecho. Ante esta ambivalencia, los bancos librados comenzaron a exigir que se garantizaran expresamente los endosos previos que constaban en el documento, y así se generalizó la práctica de endosar con las siglas "P.E.G.". 6 *Banking Law* Sec. 128.03 (1987); H.J. Bailey, *Brady on Bank Checks*, 6ta ed., Boston, Ed. Warren, Gorham & Lamont, 1987, Sec. 12.10; *Crocker-Woolworth Nat. Bank v. Nevada Bank*, 73 P. 456 (1903).

Aunque en un principio se interpretó que el endoso "P.E.G." era simplemente un pasaporte que tenía el cheque para pasar por los canales bancarios, *Aetna Casualty & Surety Co. v. Corpus Christi Nat. Bank*, 186 S.W.2d 840 (1944), limitado a sus hechos particulares en *Republic Nat. Bank of Dallas v. Southern Brokerage Co.*, 338 S.W.2d 295 (1960), posteriormente la jurisprudencia se inclinó a resolver que, en efecto, el endoso "P.E.G." era una garantía expresa que daba el banco endosante al banco librado de que los endosos previos que constaban en el instrumento eran genuinos. *Chilson v. Capital Bank of Miami, Fla.*, supra; *Federal Deposit Insurance Corp. v. Marine National Bank*, 303 F. Supp. 401 (D. Fla. 1969); *Roswell Bank v. Citizens & Southern De Kalb Bank*, 121 S.E.2d 706 (1961); *First Nat. Bank v. North Jersey Trust Co.*, 14 A.2d 765 (N.J. 1940); *Security Sav. Bank v. First Nat. Bank*, 106 F.2d 542 (6to Cir. 1939); *United States v. National City Bank of New York*, 28 F. Supp. 144 (D. N.Y. 1939); *Hartford-Connecticut Trust Co. v. Riverside Trust Co.*, 197 A. 766 (1938).

El alcance del endoso "P.E.G." se extendió para imponer responsabilidad al banco endosante en aquellas situaciones en que el banco librado pagaba un cheque a la orden de dos (2) beneficiarios, cuya negociación se llevó a cabo faltando el endoso de uno de ellos. *First Nat. Bank, Etc. v. Trust Co. of Cobb Cty.*, 510 F. Supp. 651 (D. Ga. 1981); *Roswell Bank v. Citizens & Southern De Kalb Bank*, supra. Igualmente, se extendió para imponer responsabilidad al banco endosante en los casos en que había un endoso irregular en el instrumento. *First Nat. Bank v. North Jersey Trust Co.*, supra. La Puerto Rico Clearing House Association, Inc. le reconoció idéntico alcance al endoso "P.E.G." al disponer en la Regla 9 de las *Rules Governing the Exchanges* lo siguiente:

> The above indorsement in the items represents that the presenting member guaranties all prior indorsements, that the payee indorsement is authentic and legal and also guaranties, if any prior indorsement is missing or unidentifiable, that the funds have been placed to the credit of the payee of the check or of a holder in due course.(4)

Sin embargo, no estaba claro si el endoso "P.E.G." hacía responsable al banco endosante ante el banco librado por el pago de un cheque alterado. En *New York P.E. Bank v. Twelfth Ward Bank*, 119 N.Y. Supp. 988 (1909), se resolvió que el endoso "P.E.G." garantizaba al banco librado que el cheque era genuino. Igualmente, en *Michie*, supra, Sec. 298, se señala que: "A drawee bank after paying an altered check may recover from the indorser bank on its warranty of the genuineness of the instrument and all prior indorsements."

Por el contrario, Bailey, *op. cit.*, Sec. 12.11, considera que el endoso "P.E.G." no garantiza que el documento no haya sido alterado. Sin embargo, fundamenta su señalamiento en el caso de *Aetna Casualty & Surety Co. v. Corpus Christi*

---

(4) *Rules Governing the Exchanges* de la Clearing House Association, Inc., *exhibit* conjunto 19, según enmendado, al 16 de marzo de 1989.

*Nat. Bank,* supra, que no le reconoció a las siglas "P.E.G." el efecto de un endoso.

Todas estas diferencias habidas en lo referente a la naturaleza y al alcance del endoso "P.E.G." quedaron disipadas con la adopción del Código Uniforme de Comercio en las jurisdicciones estatales. Este código se ocupó de reglamentar, en su Art. 4, los depósitos bancarios y el proceso interbancario de cobro de cheques. Se adoptaron normas ya establecidas por diversos estatutos, decisiones de los tribunales estatales y por la *American Bankers Association Code* con el propósito de establecer uniformemente los principios básicos que reglamentarían dicho proceso. 5 *Hawkland, Learly & Alderman, UCC Series* Sec. 4–101 (Art. 4).

En aras de aligerar el tráfico de los instrumentos negociables y dar estabilidad al proceso de cobro de los mismos, la Sec. 4–207 del Código Uniforme de Comercio, *Hawkland, Learly & Alderman,* supra, que regula la responsabilidad de los bancos, dispuso que el banco que presenta al cobro un instrumento negociable ofrece automáticamente unas garantías cuando transfiere el documento sin que sea necesario endosar el mismo con las siglas "P.E.G.".[5] Esta sección sujeta al banco que transfiere el documento a las mismas responsabilidades que tenía el que endosaba con las siglas "P.E.G." antes de la adopción del Código Uniforme de Co-

---

[5] "Sec. 4–207. Warranties of Customer and Collecting Bank on Transfer or Presentment of Items; Time for Claims.

"(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who is good faith pays or accepts the item that

"(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and

"(b) he has no knowledge that the signature of the maker or drawer is unauthorized, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith

"(i) to a maker with respect to the maker's own signature; or

"(ii) to a drawer with respect to the drawer's own signature, whether or not the drawer is also the drawee; or

mercio. En el *Official Comment* de la Sec. 4–207 se explicó que:

> In addition to imposing upon customers and collecting banks the warranties and engagements imposed by the original Sections 65 and 66 of the Uniform Negotiable Instruments Law and those of Sections 3–414 and 3–417 of Article 3, with some variations, this Section 4–207 is intended to give the effect presently obtained in bank collections by the words "prior indorsements guaranteed" in collection transfers and presentments between banks. The warranties and engagements arise automatically as a part of the bank collection process. *Hawkland, Learly & Alderman,* supra, Sec. 4–207 n. 2.

Las garantías que ofrece el banco al transferir el cheque son: que tiene buen título sobre el instrumento, que la firma del librador es auténtica y que el documento no ha sido materialmente alterado. El banco presentante puede ofrecer estas garantías ya que, entre los bancos que intervienen en este proceso, el primer banco en la cadena al tomar el instrumento de manos del tenedor está en mejor posición de examinar meticulosamente el cheque y ofrecer las garantías a los bancos a los que les transfiera el documento. A su vez,

---

"(iii) to an acceptor of an item if the holder in due course took the item after the acceptance or obtained the acceptance without knowledge that the drawer's signature was unauthorized; and

"(c) the item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith

"(i) to the maker of a note; or

"(ii) to the drawer of a draft whether or not the drawer is also the drawee; or

"(iii) to the acceptor of an item with respect to an alteration made prior to the acceptance if the holder in due course took the item after the acceptance, even though the acceptance provided 'payable as originally drawn' or equivalent terms; or

"(iv) to the acceptor of an item with respect to an alteration made after the acceptance." 5 *Hawkland, Learly & Alderman, UCC Series* Sec. 4–207 (Art. 4).

esto aligera el proceso de cobro, ya que cada banco en la cadena descansa en esas garantías y no tiene que examinar cada cheque que recibe rigurosamente. En caso de que se pague un instrumento falsificado o alterado, el banco librado puede recobrar del banco presentante la cantidad desembolsada por virtud de las garantías que el último le ofreció al primero. *Chilson v. Capital Bank of Miami, Fla.*, supra; *Federal Deposit Insurance Corp. v. Marine National Bank*, supra; *Birmingham Trust Nat. Bank v. Central Bank & T. Co.*, 275 So. 2d 148 (1973); S.J. Donnelly y M.A. Donnelly, *Commercial Law*, 35 (Núm. 1) Syracuse L. Rev. 98 (1984).

Las disposiciones del Código Uniforme de Comercio, según resolviéramos en *Acevedo v. Citibank*, 115 D.P.R. 768 (1984), no aplican en nuestra jurisdicción. Por lo tanto, el banco que transfiere un cheque en nuestra jurisdicción no ofrece automáticamente las garantías de la Sec. 4–207 del Código Uniforme de Comercio. Sin embargo, estas disposiciones son ilustrativas de la tendencia moderna a imponer responsabilidad a los bancos que transfieren un cheque como si se tratara de endosantes que negocian un instrumento negociable fuera de los canales bancarios.

Las garantías que ofrece el banco que transfiere un cheque bajo la Sec. 4–207, entre las que se garantiza que el documento no ha sido alterado, son básicamente las mismas que por virtud de la Sec. 3–417 del mismo código ofrece el que negocia un documento mediante endoso.

Se trata, a su vez, de las mismas garantías que ofrecía un endosante bajo la Ley de Instrumentos Negociables de 1896 en su Art. 65,[6] que vienen a ser las recogidas en nuestra

---

[6] Citado en la nota al calce Núm. 3.

Ley Uniforme de Instrumentos Negociables, Arts. 418 y 419 del Código de Comercio, 19 L.P.R.A. secs. 116 y 117.(7)

■ En vista de que no es oneroso imponer al banco que recibe el cheque de manos del tenedor el deber de examinarlo meticulosamente y que, por el contrario, al así hacerlo le brinda estabilidad al proceso interbancario de transferencia de cheques, adoptamos la tendencia moderna que equipara las garantías que ofrece un banco con las que ofrece un endosante, y resolvemos que el endoso "P.E.G." es una garantía expresa que brinda el banco endosante de que el cheque es genuino y de que no ha sufrido una alteración esencial. Por tal razón, Royal Bank le responde al Citibank y

---

(7) Disponen que:

*"Sec. 116. Qué garantiza la persona que negocia un documento*

"Toda persona que negociare un documento mediante su entrega o por endoso calificado, garantiza—

"(1) Que el documento es genuino y que es en todo sentido lo que representa;

"(2) que tiene un buen título de propiedad sobre el mismo;

"(3) que todas las partes que le hayan precedido tenían capacidad para contratar;

"(4) que no tiene conocimiento de hecho alguno que pueda perjudicar la validez del documento o dejarlo sin efecto.

"Pero cuando la negociación se hiciere mediante la entrega solamente, esa garantía no favorecerá sino al cesionario inmediato.

"Las disposiciones del inciso (3) de esta sección no serán aplicables a las personas que negociaren valores públicos o de corporaciones que no sean giros y pagarés.—Código de Comercio, 1932, art. 418.

*"Sec. 117. Qué garantiza el endosante incondicional*

"Toda persona que endose un documento sin condición alguna, garantiza a todos los subsiguientes tenedores de buena fe—

"(1) Lo mencionado en los incisos (1) a (3) de la sección inmediatamente anterior;

"(2) que el documento, en el momento de su endoso, era válido y estaba en toda su fuerza y efecto.

"Y además se compromete a que será aceptado o pagado, o ambas cosas, según fuere el caso, [a la] debida presentación del mismo, de acuerdo con sus términos; y a que, si no se hiciere honor al documento y se hubiere seguido debidamente el procedimiento necesario en ese caso, pagará el importe del documento al tenedor o a cualquier endosante subsiguiente que pudiera ser obligado al pago.—Código de Comercio, 1932, art. 419."

L.A.T.Co. le responde a Royal Bank por la cantidad pagada por el documento alterado.

## IV

Aun cuando la responsabilidad de L.A.T.Co. no está sujeta a la negligencia en que haya podido incurrir, sino al endoso que hizo en el instrumento, resta por considerar el tercer señalamiento de error en el cual alega la recurrente que erró el tribunal de instancia al concluir que L.A.T.Co. fue negligente en el manejo del cheque. No se cometió el error señalado.

En lo referente a las actuaciones de L.A.T.Co., el tribunal concluyó en sus determinaciones de hecho lo siguiente:

7) El día 25 de marzo de 1983, una persona depositó en la cuenta que fue abierta a nombre de Héctor Rivera Rivera con LATCO el cheque número 3410 girado contra la cuenta número 021-502040 que mantiene la Autoridad de Energía Eléctrica (en adelante "AEE") con el Citibank, N.A. (en adelante "Citibank"). El cheque había sido alterado eliminando el nombre de John Grazel Inc. y sustituyéndolo por el nombre de Héctor Rivera Rivera. El nombre y la dirección de Héctor Rivera Rivera fue intercalado a maquinilla en un tipo de letra diferente y con un color de tinta distinto a los utilizados en la preparación original del cheque. La persona que hizo la sustitución no eliminó los números 00914 del *zip code* del correo que fue parte de la dirección de John Grazel Inc.

8) El día viernes 25 de marzo de 1983, el antes descrito cheque fue endosado con la firma de Héctor Rivera Rivera y depositado individualmente a través de un cajero de LATCO en la cuenta de Héctor Rivera Rivera. La firma del endoso del cheque 3410 se aparta en algunos aspectos de la firma que aparece en el convenio de cuenta corriente entre LATCO y Héctor Rivera Rivera y los cheques utilizados para retirar el dinero de la cuenta de LATCO. Por un lado emerge un patrón que incluye las firmas de los cheques utilizados para retirar el dinero de la cuenta y la firma contenida en el convenio de cuenta corriente. Por otro lado, se encuentra fuera del patrón

antes mencionado la firma del cheque 3410. Nótese que la firma del cheque 3410 es menos legible en el sentido de no notarse cada letra que compone el nombre en comparación con las otras firmas del patrón mencionado. El Tribunal aclara que por ausencia de prueba pericial no puede afirmar si todas las firmas fueron estampadas por la misma persona o por varias personas. Ahora bien, aunque la forma del cheque 3410 hubiese sido estampada por la misma persona que suscribió el convenio de cuenta corriente, las diferencias entre una firma y la otra (de haber un oficial pagador comparado [sic] las firmas) eran suficientes para solicitarle a la persona que presentó el cheque que volviera a firmar el cheque 3410 en presencia del oficial pagador o que de alguna manera aclarara el asunto. No surge que LATCO haya tomado estas medidas de cautela. El testigo Luis Felipe Aldea expresó que LATCO se toma mayores cuidados cuando el banco girado es LATCO que cuando el banco girado es otro. Anejo I, págs. 5–6.

La determinación de negligencia a la que llegó el tribunal de instancia está sostenida por la prueba que tuvo ante su consideración. *Vda. de Delgado v. Boston Ins. Co.*, 99 D.P.R. 714, 724 (1971).[8] En ausencia de error manifiesto, en la apreciación de la prueba no procede intervenir con las determinaciones de hecho del tribunal de instancia. *La Costa Sampedro v. La Costa Bolívar*, supra; *Morán Simó v. Gracia Cristóbal*, supra; *Epstein v. F. & F. Mortgage Corp.*, supra; *Ortiz v. Cruz Pabón*, supra.

---

[8] Un examen del cheque alterado confirma la corrección de las determinaciones de hecho del foro de instancia. Al comparar el tipo de letra utilizado en el nombre y en la dirección de Héctor Rivera Rivera con la letra utilizada en la fecha, la cantidad y el número de cheque, podemos concluir que se trata de dos (2) tipos de letras diferentes. Además, podemos observar que todavía en el cheque permanece el *zip code* 00914 que pertenece a la dirección del beneficiario original John Grazel, Inc., en un tipo de letra distinto a la dirección de Héctor Rivera Rivera. Véase, copia del referido cheque que acompañamos como apéndice a la opinión.

## V

Finalmente, alega el recurrente que erró el tribunal de instancia al imponerle el pago de intereses al 12% anual desde la fecha de presentación de la demanda, y la suma de $2,500 por concepto de honorarios de abogado.

La imposición de honorarios de abogado, así como la imposición de intereses bajo la Regla 44.3(b) de Procedimiento Civil, 32 L.P.R.A. Ap. III, procede en aquellos casos en que el tribunal entienda que la parte a quien le impuso éstos procedió con temeridad. *Fernández v. San Juan Cement Co., Inc.*, 118 D.P.R. 713 (1987); *Colondres Vélez v. Bayrón Vélez*, 114 D.P.R. 833 (1983); *Insurance Co. of P.R. v. Tribunal Superior*, 100 D.P.R. 405 (1972); *Font v. Pastrana*, 73 D.P.R. 247 (1952). No procede con temeridad el que litiga una cuestión de derecho novel, no resuelta anteriormente en nuestra jurisdicción. *M. Quilichini Sucrs., Inc. v. Villa Inv. Corp.*, 112 D.P.R. 322 (1982); *Morales Garay v. Roldán Coss*, 110 D.P.R. 701 (1981); *Caloca v. C.I.A.A.*, 108 D.P.R. 164 (1978); *United Hotels of P.R. v. Willig*, 89 D.P.R. 188 (1963). Esa es precisamente la situación ante nos. Por tal razón, procede modificar la sentencia del tribunal de instancia en lo referente a la imposición de honorarios e intereses por temeridad.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Hernández Denton emitió voto concurrente.

APENDICE

—O—

Voto concurrente emitido por el Juez Asociado Señor Hernández Denton.

No podemos suscribir en su totalidad la opinión que hoy emite el Tribunal. Aunque estamos de acuerdo con las partes I, III y V de la ponencia mayoritaria, entendemos que la controversia sobre la posible negligencia de la Autoridad de Energía Eléctrica (en adelante Autoridad) no fue adecuadamente considerada en la parte II de la opinión. Por otro lado, nos preocupan los pronunciamientos de la parte IV que, mediante *obiter dictum*, imparten su aprobación a unas conclusiones erróneas del tribunal de instancia.

## I

Con relación a la cuestión de negligencia de la Autoridad, según surge de los autos, esta dependencia gubernamental solicitó la paralización del pago del cheque emitido a John Grazel, Inc. catorce (14) días después de haber recibido notificación escrita de que el tomador no había recibido el cheque. Apoyándose en las determinaciones de hecho del tribunal a quo relativas al gran volumen de cheques que genera la Autoridad, y a la existencia de suficientes controles internos en su procesamiento, la mayoría resuelve que la Autoridad no incurrió en negligencia. Sin embargo, esas determinaciones de instancia son perfectamente compatibles con la afirmación de los demandados de que la Autoridad no fue diligente al demorarse demasiado en ordenarle al Citibank suspender el pago del cheque en cuestión. No obstante, correspondía a los recurrentes demostrar que la Autoridad pudo frustrar el fraude al notificar oportunamente al banco de la irregularidad para evitar su pago.

Ni en los autos ni en el expediente de este caso hay prueba de que con una notificación más rápida de la orden de suspensión de pago se hubiese podido prevenir la pérdida.

Por el contrario, de los hechos estipulados se desprende que el *28 de marzo de 1983* el Citibank le transfirió los fondos del cheque en cuestión al Banco de San Juan y éste, a su vez, a Las Américas Trust Co. (L.A.T.Co.). La notificación escrita de John Grazel, Inc. se recibió en la Autoridad el *29 de marzo de 1983*. Por otro lado, L.A.T.Co. puso a disposición del depositante los fondos el *30 de marzo de 1983*.

Aunque los principales retiros del depositante no se efectuaron hasta el 31 de marzo y 4 de abril de 1983, el récord está huérfano de prueba sobre las medidas que L.A.T.Co. pudo haber tomado de haber sido notificado por el Citibank entre el 30 de marzo y el 4 de abril de 1983, que no honraría el pago del cheque. Tampoco hay evidencia que sostenga que el Citibank estaba facultado a negarse a honrarle a L.A.T.Co. el cheque en cuestión, luego de haberle transferido los fondos a través de la Cámara de Compensación.

En conclusión, L.A.T.Co. no demostró que la pérdida se hubiese evitado si la Autoridad hubiese actuado con mayor premura.

## II

Finalmente, los pronunciamientos de la parte IV de la opinión mayoritaria no son esenciales en la adjudicación de esta controversia, porque la responsabilidad de L.A.T.Co. emana del hecho de haber estampado su endoso al cheque como paso previo a ponerlo al cobro en la Cámara de Compensación.

Nos preocupa que al citarse con aprobación las determinaciones de hecho del foro de instancia se pueda entender que los bancos tienen la obligación de verificar la firma de los endosantes de los cheques que reciben antes de tramitar su cobro. No hay disposición de ley alguna que obligue a estas instituciones a seguir este procedimiento.

Al recibir cheques para acreditarlos en las cuentas correspondientes, los bancos actúan como agentes del deposi-

tante para el cobro de los mismos a través de la Cámara de Compensación. Por esta razón, los bancos no están obligados a brindar disponibilidad inmediata a los fondos ingresados en cuentas de depósito de cheques. No creemos que en este caso L.A.T.Co. se haya apartado de la práctica y de la costumbre bancaria.

Por estos motivos, aunque concurrimos con la opinión mayoritaria de que procede la confirmación de la sentencia recurrida, no endosamos los pronunciamientos en las partes II y IV referentes a los controles internos de la Autoridad y a las responsabilidades del primer banco en la cadena de verificar la firma de los endosantes. L.A.T.Co. es responsable únicamente porque el endoso "P.E.G." es una garantía expresa de que el cheque es válido, y por eso responde al Royal Bank.